[No. F003185. Fifth Dist. Aug. 9, 1985.]

KERN RIVER PUBLIC ACCESS COMMITTEE et al.,
Plaintiffs and Respondents, v.
CITY OF BAKERSFIELD, Defendant and Appellant;
KERN RIVER DEVELOPMENT COMPANY, INC.,
Real Party in Interest and Appellant.

**COUNSEL**

Richard J. Oberholzer, City Attorney, for Defendant and Appellant.

Clifford, Jenkins & Brown and Stephen T. Clifford for Real Party in Interest and Appellant.

Kuhs & Parker, James R. Parker, Jr., Teri A. Bjorn, Richard A. Monje, Thomas C. Fallgatter, Fawn Kennedy-Dessy, Young, Wooldridge, Paulden, Self, Farr & Griffin and Philip W. Ganong for Plaintiffs and Respondents.

---

**OPINION**

**FRANSON, Acting P. J.**—This appeal requires a determination of the meaning of various provisions of the "PUBLIC ACCESS TO PUBLIC RESOURCES," article 3.5 of the Government Code (§ 66478.1 to § 66478.14) which require a subdivider to provide reasonable public access to and an easement along a portion of the bank of any river or stream bordering or lying within a proposed subdivision. The decision will affect future subdivisions adjoining all navigable waters of this state.

The appellant and real party in interest, Kern River Development Company, Inc. (appellant), and its owner, George Nickel, own the land on both sides of the Kern River from the mouth of Kern River Canyon downstream for a distance of about five and one-half miles. Rancheria Road is the only road that crosses the Kern River in this area. Appellant wants to subdivide a tract of land bordering the river, but does not want the public to have access to or any easement along the portion of the riverbank within the subdivision. Mr. Nickel and his employees have tried in the past to prevent public access to the Kern River. (See *People* v. *Sweetser* (1977) 72 Cal.App.3d 278 [140 Cal.Rptr. 82], where this court held that the Kern River is a navigable river for purposes of boating and other recreational pleasures by the public and reversed a trespassing conviction of a man arrested by Mr. Nickel's security guard for kayaking on the river.)

Respondents are Oliver and Dennis West, two avid fishermen[1] who were arrested by appellant's security guards for fishing from the bank of the river upstream from Rancheria Road, and the Kern River Public Access Com-

---

[1] Respondents apparently are devotees of President Hoover's philosophical observation that "Fishing is a chance to wash one's soul with pure air, with the rush of the brook, or with the shimmer of the sun on the blue water.

"It brings meekness and inspiration from the scenery of nature, charity toward tackle makers, patience toward fish, a mockery of profits and egos, a quieting of hate, . . .

"And it is discipline in the equality of man—for all men are equal before fish." (Hoover, Fishing For Fun and to Wash Your Soul (1963) Foreword.)

mittee, a nonprofit corporation organized by two of its present attorneys, Mr. Thomas Fallgatter and Mrs. Fawn Kennedy-Dessy. (These respondents were petitioners below.)

Appellant's tract 4179A, the immediate subject of controversy (hereinafter the subdivision), is a proposed 11-acre, 8-lot, single-family subdivision. It is the second part of a three tract project. Tract 4009, the first tract, is already in place downstream from and adjacent to the subdivision. Proposed tract 4179B is upstream from the subdivision. All of these tracts front on Rancheria Road and border on the Kern River. Each has private roads providing access to the lots, and each is surrounded by a "common lot" that covers the steepest slopes of the bluffs and the banks of the river. None of the land inside any of these three tracts is dedicated for public use or access to the Kern River or the riverbank.

The city had been concerned with providing greater public access to the Kern River, and the city staff and other interested groups began negotiating with appellant an overall "Kern River Access Plan" which included an agreement to provide access to the river and parking near the Rancheria Road bridge, downstream and on the other side of the river from the subdivision.

The city planning commission rejected the subdivision because the tentative map did not provide any public access to the river or along its bank within the subdivision. Appellant's appeal to the city council was set at the time that the city council was to consider the overall Kern River Access Plan. At the hearing, respondent's attorney, Mr. Fallgatter, who was also a member of the planning commission, made an appearance before the city council as a "private citizen." In his remarks, he opposed the overall Kern River Access Plan, but encouraged the city council to accept the subdivision with the alternative offsite access to the river.

After appellant deeded the easements for parking and alternative access to the city, the subdivision was finally approved by the city council. The council resolution included a finding that there was reasonable public access to the river within a reasonable distance of the subdivision.[2]

The trial court issued a peremptory writ of mandate directing the city to rescind approval of the tentative and final maps of the subdivision and to

---

[2]This resolution was not adopted until after the action at bench was concluded; however, in view of our conclusion concerning the proper interpretation of the statutory language at issue, we do not consider whether this resolution had retroactive effect.

not approve any further development of the tract until the map provides for a dedication of public easements "from a public access either across such tract or within a reasonable distance from such tract to that portion of the Kern River which borders or lies within such tract, and . . . until the map . . . provides for dedication of a public easement along that portion of the bank of the Kern River which borders or lies within such tract." The trial court also awarded costs and attorney's fees against the city. This appeal followed.

I. *The trial court properly found that the offsite easements for public parking and access to the river do not comply with the "PUBLIC ACCESS TO PUBLIC RESOURCES" article.*

The issues presented by this appeal involve Government Code sections 66478.4, 66478.5 and 66478.8.[3] Section 66478.4, subdivision (a), requires

---

[3]Government Code section 66478.4 reads: "(a) No local agency shall approve either a tentative or a final map of any proposed subdivision to be fronted upon a public waterway river or stream which does not provide, or have available, *reasonable public access by fee or easement from a public highway to that portion of the bank of the river or stream bordering or lying within the proposed subdivision.*

"(b) *Reasonable public access* shall be determined by the local agency in which the proposed subdivision is to be located. In making the determination of what shall be reasonable access, the local agency shall consider all of the following:

"(1) That access may be by highway, foot trail, bike trail, horse trail, or any other means of travel.

"(2) The size of the subdivision.

"(3) The type of riverbank and the various appropriate recreational, educational, and scientific uses, including, but not limited to, swimming, diving, boating, fishing, water skiing, scientific collection and teaching.

"(4) The likelihood of trespass on private property and reasonable means of avoiding such trespasses.

"(c) A public waterway river or stream for the purposes of Sections 66477.2, 66478.4, 66478.5 and 66478.6 means those waterways, rivers and streams defined in Sections 100 through 106 of the Harbors and Navigation Code, any stream declared to be a public highway for fishing pursuant to Sections 25660 through 25662 of the Government Code, the rivers listed in Section 1505 of the Fish and Game Code as spawning areas, all waterways, rivers and streams downstream from any state or federal salmon or steelhead fish hatcheries." (Italics added.)

Government Code section 66478.5 reads: "(a) No local agency shall approve either a tentative or a final map of any proposed subdivision to be fronted upon a public waterway river or stream which does not provide for a dedication of *a public easement along a portion of the bank of the river or stream bordering or lying within the proposed subdivision.*

"(b) The extent, width and character of the public easement shall be reasonably defined to achieve reasonable public use of the public waterway river or stream consistent with public safety. The reasonableness and extent of the easement shall be determined by the local agency in which the proposed subdivision is to be located. In making the determination for reasonably defining the extent, width, and character of the public easement, the local

local agencies to reject proposed subdivision maps unless they "provide, or have available, reasonable public access by fee or easement from a public highway *to that portion* of the bank of the river or stream bordering or lying within the proposed subdivision." (Italics added.) Section 66478.4, subdivision (b), directs the public agency to consider in determining reasonable public access, among other factors, "the type of riverbank and the various appropriate recreational, educational and scientific uses . . . ." These provisions are similar to those in section 66478.11 (pertaining to public access "to land below the ordinary high water mark on any ocean coastline or bay shoreline . . .") and section 66478.12 (pertaining to public access "to any water of the lake or reservoir . . ."). Section 66478.5, subdivision (a), requires, in addition to section 66478.4's "access to" the riverbank, an "easement *along a portion of* the bank of the river . . . bordering or lying within the proposed subdivision." (Italics added.) This additional requirement for an easement "along" the river or stream bank is unlike anything in the sections providing access to lakes, reservoirs or coastlines, in that it requires the dedication of an easement on land inside the subdivision and along the riverbank, beyond the public's existing right to use the river below the high water line. The sections applicable to lakes, reservoirs and coastal property only require access to the water itself or to land that is already considered available to the public. (See *State of California* v. *Superior Court (Lyon)* (1981) 29 Cal.3d 210 [172 Cal.Rptr. 696, 625 P.2d 239].)

The legislative policy behind sections 66478.4, 66478.5 and 66478.8 is expressed in the first three sections of the "PUBLIC ACCESS TO PUBLIC RESOURCES" article. Section 66478.1 entitled "Legislative intent" provides, "It is the intent of the Legislature, . . . to implement Section 2 of Article XV of the California Constitution insofar as Sections 66478.1 through 66478.10 are applicable to navigable waters." (Fn. omitted.) ▮ (See fn.

agency shall consider all of the following:
 "(1) That the easement may be for a foot trail, bicycle trail, or horse trail.
 "(2) The size of the subdivision.
 "(3) The type of riverbank and the various appropriate recreational, educational and scientific uses including, but not limited to, swimming, diving, boating, fishing, water skiing, scientific collection and teaching.
 "(4) The likelihood of trespass on private property and reasonable means of avoiding such trespasses." (Italics added.)
 Government Code section 66478.8 reads: "Nothing in Sections 66478.1 through 66478.10 of this article shall require a local agency to disapprove either a tentative or final map solely on the basis that the *reasonable public access* otherwise required by this article is not provided through or across the subdivision itself, if the local agency makes a finding that such reasonable public access is otherwise available within a reasonable distance from the subdivision.
 "Any such finding shall be set forth on the face of the tentative or final map." (Italics added.)
 All references are to the Government Code unless otherwise noted.

**4.)** California Constitution, article X, section 4 (formerly Cal. Const., art. XV, § 2), provides, "No individual, partnership, or corporation, claiming or possessing *the frontage* or tidal *lands of* a harbor, bay, inlet, estuary, or other *navigable water* in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and *the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall always be attainable for the people thereof.*" (Italics added.)[4]

Section 66478.2 entitled "Legislative findings; diminishing public access" provides, "The Legislature finds and declares that the public natural resources of this state are limited in quantity and that the population of this state has grown at a rapid rate and will continue to do so, thus increasing the need for utilization of public natural resources. The increase in population has also increased demand for private property adjacent to public natural resources through real estate subdivision developments which resulted in diminishing public access to public natural resources." As a consequence of this finding, section 66478.3, entitled "Legislative finding; health and well-being" was adopted which provides, "The Legislature further finds and declares that it is essential to the health and well-being of all citizens of this state that *public access to natural resources be increased. It is the intent of the Legislature to increase public access to public natural resources.*" (Italics added.)

■ The above quoted constitutional directive of a liberal construction of laws giving public access to the navigable waters of the state (§ 66478.1) and the legislative concern about the diminishing public access to our public natural resources (§ 66478.2) coupled with the declared purpose of increasing the public access to our public natural resources (§ 66478.3) mandates that the provisions of sections 66478.4, 66478.5 and 66478.8 be construed in a manner which will provide the maximum public access to the navigable

---

[4]The public's right to use the navigable waters of this state are extremely broad and encompass the right to use rivers for all recreational purposes such as boating, swimming, fishing and hunting. (*People* ex rel. *Baker* v. *Mack* (1971) 19 Cal.App.3d 1040, 1045 [97 Cal.Rptr. 448].) Moreover, the public right is "sufficiently flexible to encompass changing public needs." (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259 [98 Cal.Rptr. 790, 491 P.2d 374].) This use includes "preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area." (*Id.*, at pp. 259-260.) Finally, because of "population pressures, demands for recreational property, and the increasing development of seashore and waterfront property," the public's right of access to navigable waters is of great public importance and must be expansively interpreted. (*Id.*, at p. 257.)

rivers of our state. With these constitutional and legislative directives in mind we turn, first, to an analysis of the scope of section 66478.8.

Section 66478.8 is at the crux of this controversy. It states: "Nothing in Sections 66478.1 through 66478.10 of this article shall require a local agency to disapprove either a tentative or final map solely on the basis that the reasonable public access otherwise required by this article is not provided through or across the subdivision itself, if the local agency makes a finding that such reasonable public access is otherwise available within a reasonable distance from the subdivision.

"Any such finding shall be set forth on the face of the tentative or final map." Appellants frame the issue as whether "reasonable public access otherwise provided by this article" only includes the "reasonable public access . . . to" the riverbank described in section 66478.4, subdivision (a), or does it also include the "easement along a portion of" the riverbank described in section 66478.5, subdivision (a)? If only the former, then an offsite easement for use of the riverbank does not comply with the law. If both, then appellants contend that any reasonable access to and easement along some other part of the riverbank, outside the subdivision, will comply with the law. As we shall explain, appellants have misstated the issue and their contention must fall.

The terms of section 66478.8 only allow reasonable alternatives to the "access *to*" (italics added) the riverbank described in section 66478.4. Sections 66478.4 and 66478.8 use the same terms: "reasonable public access." Section 66478.8 refers to alternatives to access "through or across" the subdivision, not alternatives to easements *along* the riverbank within the subdivision. Nothing in section 66478.5, subdivision (a), refers to "reasonable public access"; its "public easement along" the riverbank, while possibly limited to a trail, also involves the public's right to educational, scientific and recreational uses beyond mere access. The other public access sections on lakes and coastal property do not provide helpful analogies because they do not require "public easements" like those described in section 66478.5 (cf. §§ 66478.11, 66478.12).

The "access" described in section 66478.4 is to "that portion of the bank of the river or stream bordering or lying within the proposed subdivision." It is not simply access to the river itself, or to some part of the riverbank (whether in or bordering the subdivision or not). Under section 66478.8, the alternative public access described is "the reasonable public access otherwise required . . . ." Even without considering the easement along the riverbank described in section 66478.5, sections 66478.4 and 66478.8, read

together, require a route for public access to "that portion of" the riverbank "bordering or lying within" the subdivision. Section 66478.8 only provides for reasonable alternative routes that do not cross the subdivision proper to get to the riverbank along the subdivision's border.

In this case, direct public access could be provided, under section 66478.4, by a public path from Rancheria Road to the riverbank, perhaps by opening one of the private roads in the subdivision to bicycle, pedestrian or equestrian traffic. Under section 66478.8, this is not the only way to provide the required access. Appellant could have provided an easement along the riverbank from Rancheria Road through tract 4009 into the subdivision. Then no public access route would cross the subdivision, but the public would still have access to the riverbank bordering or lying within the subdivision.

Appellants' interpretation of section 66478.8 would eliminate public access to the riverbank inside or bordering the subdivision altogether, in favor of other forms of access to the river and to other parts of the riverbank. This does violence to the language of the statute itself, because it does not provide the "reasonable public access otherwise required" by the law. That access "otherwise required" is to "that portion of the bank of the river or stream bordering or lying within the proposed subdivision." (§ 66478.4, subd. (a).)

As noted above, appellants have misstated the issue. It is not simply whether section 66478.8 provides an alternative to the easements "along" the riverbank (of § 66478.5) as well as an alternative to the public access "to" (of § 66478.4). The real question is whether the alternative access allowed by section 66478.8 may be access to a different area of the riverbank, outside the subdivision and not along its border. There is nothing in the language of the statute that supports this interpretation of section 66478.8. Furthermore, such an interpretation would be contrary to the constitutional and legislative directive referred to above that a liberal interpretation shall be given to the statutory scheme expressed in the "PUBLIC ACCESS TO PUBLIC RESOURCES" article to the end that public access to our navigable rivers *be increased.* "Access" is meaningless unless it is access *to* something. Section 66478.4 makes it clear that the access involved here is to the *banks* of the river inside or on the border of the subdivision. Section 66478.8 provides for alternative access *routes* but does not provide any alternative to the *object* of the access. It still requires reasonable public access "to that portion of the bank of the river or stream bordering or lying within the subdivision" (§ 66478.4, subd. (a)), so even if "access" in section 66478.8 did include the "easement" required by section 66478.5, the

alternative access plan accepted by the city in this case is not in compliance because it only provides access to and an easement along the wrong part of the riverbank.

Appellants' arguments to support their interpretation that section 66478.8's "alternative access" provisions encompass the easement along the riverbank under section 66478.5 are:

1. The opening phrase of section 66478.8, "Nothing in Sections 66478.1 through 66478.10 of this article shall require . . ." is clear and direct; it means that section 66478.8 applies to section 66478.5 as well as section 66478.4.

2. "Public access," in its dictionary definition, is similar to "easement" in its dictionary definition, so section 66478.8 applies to both the public access required by section 66478.4 and the public easement required by section 66478.5.

3. The trial court's interpretation of section 66478.8 as applying to access under section 66478.4 and not easements under section 66478.5 effectively "rewrites" the statute by making its reference to other sections, including section 66478.5, "surplusage."

4. If section 66478.8 was only intended to modify section 66478.4, it should have been a subsection of section 66478.4, not a separate section.

5. The interpretation used by the trial court, requiring access within a reasonable distance from the subdivision to that portion of the bank lying within the subdivision "rewrote" the statute in a way that would *reduce* public access to public resources.

6. "Legislative history" supports appellants' position.

None of these arguments is convincing. Each of the first four assumes that the object of the "access" required is the river itself, not "that portion of the *bank* . . . bordering or lying within the subdivision." (Italics added.) This assumption ignores the specific language of both sections 66478.4 and 66478.5.

The terms "public access" and "public easement" certainly have similar, even overlapping meanings, but they are not synonymous. "Access" is a route to the riverbank which may be on land subject to a public easement or owned in fee by the public. (§ 66478.4.) The public easement

along the riverbank is more than a route to the bank, it is the right to use some part of the bank to fish, bathe, engage in educational or scientific activity and the like. The terms are clearly distinguished by their different uses in the statute. ■ While it is a principle of statutory construction that we should avoid constructions that make "surplusage" of legislative terminology, it is also a fundamental principle that when the Legislature differentiates terms, we should not ignore the distinction they have placed in a statute.

■ The claim that "access" includes "easement" as a matter of similar dictionary definitions is also unpersuasive. We have to read statutory terms in context. Here, the contextual use of these terms is clearly distinct. "Access" is used to describe a route from the highway to the riverbank in or on the border of the subdivision. (§ 66478.4.) This route need not cross the subdivision proper. (§ 66478.8.) "Easement," as used in section 66478.5, is a right to use part of that same riverbank for recreational, educational and scientific pursuits. The right to use the bank and the right to a usable route to get there are distinguishable rights. The practical right to use the bank depends on the existence of an access route, but the definition of the right to use is independent of the access route.

The claims (in arguments 3, 4 and 5 above) that the trial court "rewrote" the statute simply beg the question. The trial court did not rewrite anything unless appellants' claims about the statute are assumed to be true.

■ The claim that section 66478.8's prefatory language referring to "Sections 66478.1 through 66478.10" is turned into "surplusage" by the trial court's interpretation is very weak. The implied references to sections 66478.1, 66478.2, 66478.3, 66478.6, 66478.7, 66478.9 and 66478.10 are surplusage under either interpretation. These sections do not require access, they state legislative findings and procedures and exempt utility and industrial property from the access and easement requirements of sections 66478.4 and 66478.5. An interpretation that merely takes one more section out of the general reference in section 66478.8's prefatory language is no abuse of the statute. The operative part of section 66478.8 only refers to public "access," and public "access" is only required by section 66478.4.

The argument that section 66478.8 should have been a subsection of section 66478.4 hardly deserves comment. We have the words of the statute. It would be a highly strained interpretation to take the placement of a section as indicative of a meaning in conflict with its terms.

The contention that respondents' theory requiring access to the riverbank and an easement within or along the border of the subdivision would ac-

tually *reduce* public access to the river deserves some consideration, but is ultimately based on the narrow facts of this case, not on the overall effect of the statute. The subdivision only has about 985 feet of river frontage. The easement given to the city for alternative access reportedly has about 1,100 feet of frontage. Appellants argue that this is a greater benefit to the public than any possible access or easement within the subdivision.

This ignores the statutory scheme. If the trial court is right, and section 66478.8 does not affect the easement required by section 66478.5, then the ongoing process of subdivision development along a river can give the public access to and easements along the entire river. Each developer must provide reasonable access to some new easement for use along the bank in each new subdivision. If easements must be provided in each subdivision, the development process increases public access. If the public only has a right of access to the river and this may be satisfied by an offsite easement, then *one* alternative access point, with a minimal easement, could satisfy the statute. Then, new subdivisions in the same area would not necessarily provide *any* new access to or easements along the river. Great areas of the riverbank could be completely closed to the public just because some localized access is available somewhere in the area. In this case, if we look narrowly at the subdivision, the alternative easement offered by Kern River Development involves a greater quantity of riverfront footage. But what will happen as the rest of the river is developed? If this alternative satisfies the statutory requirement for this tract, it would also satisfy the requirement for tract 4179B and other tracts both up and down river. (Several could be placed in the area as close to the existing alternative access area as the subdivision.) If so, then the city will have no appreciable bargaining power as the rest of the river is developed, and the public's right to use the riverbank could easily be limited to this 1,100 foot easement along one side of the river forever.

A related argument is the claim, based on the Legislative Counsel's Digest (see fn. 5, *infra*), that section 66478.8 was supposed to preserve the discretion of local authorities. It is ironic that the city, as appellant herein, is seeking to radically limit its bargaining power to provide greater access to the river in future development. Under respondent's interpretation, the city has discretion to accept alternative access routes to the riverbank in the subdivision and to determine the precise dimensions of the easement along the riverbank in the subdivision. Appellants' theory would allow the city the discretion to eliminate access to the riverbank in the subdivision altogether, in favor of offsite access. This increased "discretion," however, reduces the city's bargaining power. Where it could take advantage of the statute and insist on public access to the entire riverbank as it is developed,

it could also limit its claim to a relatively narrow, localized access point, and the rest of the river could be developed in a way that closes off public access altogether. This effect is in direct conflict with the Legislature's express intent to increase public access to public natural resources. (§§ 66478.1, 66478.2 and 66478.3.)

The expressions of respect for local autonomy and local discretion should be seen for what they are. All of article 3.5 limits local discretion. The purpose of the Subdivision Map Act as a whole is, in one sense, to limit the discretion of local authorities to approve poorly planned subdivisions that adversely affect the public interest. Assurances of continued local discretion, in this context, are simply statements to make the bill more palatable to local governments. Sections 66478.8 and 66478.5 both preserve *some* local discretion, but they also take away the discretion to approve subdivisions that do not increase public access to public resources in some degree.

Appellants rely on the Legislative Counsel's Digest of the original legislation (Assem. Bill No. 1504, which included former Pub. Resources Code, § 10041, the predecessor statute to § 66478.8) creating these access and easement requirements.[5]

The digest, however, is inaccurate, in that it describes the access requirement as access to the river or stream itself, not to its banks. Aside from this inaccuracy, it is not in conflict with our interpretation of the statute. It certainly is no more precise than the statute itself. One phrase of the digest ". . . unless it is found that such reasonable public access is otherwise available within a reasonable distance . . ." could possibly be said to describe the alternative access provision of section 66478.8 as an alternative to both the "access to" and "easement along" requirements, but this is far from explicit. ■ If the digest conflicts with the statute, it must be disregarded (*California Teachers' Assn.* v. *Governing Board* (1983) 141 Cal.App.3d 606 [190 Cal.Rptr. 453]).

---

[5]This digest describes the bill as follows: "Provides that no city or county or city and county shall approve tentative or final map of subdivision fronting on public waterway river or stream, as defined, unless it provides for a reasonable public access by fee or easement from public highway to a portion of such river, or stream, as prescribed, within the proposed subdivision and a dedication of public easement along a portion of the river or stream, as prescribed, within the proposed subdivision unless it is found that such reasonable public access is otherwise available within a reasonable distance from the subdivision.

"Specifies that city or county or city and county in which proposed subdivision is to be located shall determine, with prescribed minimum standards, reasonable public access to, and reasonableness of public easement along, such river or stream." (Leg. Counsel's Dig. of Assem. Bill No. 1504, 3 Stats. 1971 (Reg. Sess.) Summary Dig., p. 251.)

 Of greater importance to the legislative intent behind section 66478.8 are the reports of two key legislative committees which reviewed Assembly Bill No. 1504 before it was adopted.

The Assembly Committee on Planning and Land Use in its summary of Assembly Bill No. 1504 stated: "This bill prohibits a local agency from approving a map for a subdivision fronting upon a public river or stream unless reasonable public access from a public highway to the river or stream is provided by fee or easement, or unless such access is available within a reasonable distance from the subdivision.

*"Also, the subdivider must dedicate a public easement along a portion of the bank of the river or stream. . . ."* (Assem. Com. on Planning and Land Use, Analysis of Assem. Bill No. 1504 (June 22, 1971).) The Senate Committee on Natural Resources and Wildlife similarly analyzed the bill: "The bill prohibits cities and counties from approving a map for a proposed subdivision fronting upon a public river or stream unless reasonable public access from a public highway is provided by fee or easement, or unless such access is available within a reasonable distance from the proposed subdivision.

*"The bill requires the subdivider to dedicate a public easement along a portion of the bank of the river or stream. . . ."* (Italics added, Sen. Com. on Natural Resources and Wildlife, Re: Public Resources (Apr. 2, 1971).) Legislative committee reports are persuasive evidence in ascertaining legislative intent where the language of a statute is doubtful. (*Southern Pac. Co. v. Ind. Acc. Com.* (1942) 19 Cal.2d 271, 275 [120 P.2d 880].) The committee reports demonstrate that the Legislature intended the bank easement to be a requirement separate and distinct from the access requirement.

We conclude therefore that the trial court correctly determined that the alternative public access provisions of section 66478.8 do not apply to the public easement requirements of section 66478.5; the alternative access provisions of section 66478.8 apply only to the access requirements of section 66478.4.

II. *Section 66478.5 requires a reasonable public easement consistent with public safety along the riverbank bordering or lying within the subdivision.*

The "Judgment Granting Peremptory Writ" ordered the city to rescind its approval of the tentative and final maps for the subdivision and to not

permit further development of the tract until the map provides for a dedication of a public easement along *"that* portion of" (italics added) the riverbank which borders or lies within such tract. Appellants argue that because the statute (§ 66478.5, subd. (a)) requires a public easement along only "*a* portion" (italics added) of the riverbank bordering or lying within the proposed subdivision, the language of the peremptory writ would require the owner to dedicate an easement along the entire riverbank within the subdivision contrary to the statute. Appellants' argument raises another question of statutory interpretation.

The statutory phrase "along *a* portion" (italics added) of the riverbank is uncertain in meaning. Narrowly construed, the language would permit the dedication of only a telephone-booth-sized easement for public viewing and entering of the river at a single location on the riverbank in the subdivision. Broadly construed, the language would require an easement along a portion of the *entire* riverbank within the subdivision.

A close examination of subdivision (b) of section 66478.5 sheds light on what the Legislature intended. The subdivision provides, "The *extent,* width and character of the public easement shall be reasonably defined to achieve *reasonable public* use of the public waterway river or stream *consistent with public safety.* The reasonableness and extent of the easement shall be determined by the local agency . . . . In making the determination for reasonably defining the extent, width, and character of the public easement, the local agency shall consider all of the following:

"(1) That the easement may be for a foot trail, bicycle trail, or horse trail.

"(2) The size of the subdivision.

"(3) The type of riverbank and the various appropriate recreational, educational and scientific uses including, but not limited to, swimming, diving, boating, fishing, waterskiing, scientific collection and teaching.

"(4) The likelihood of trespass on private property and reasonable means of avoiding such trespasses." (Italics added.)

Again, the constitutional directive of a liberal construction of laws giving public access to the navigable waters of the state (§ 66478.1) and the explicit legislative policy of increasing public access to our natural public resources (§ 66478.3) mandates that section 66478.5 be broadly construed to require the dedication of a *reasonable* public easement along the river-

bank within a subdivision. The only limitation on the public's right to such an easement is *public safety*. Unless the local agency makes appropriate findings based on competent evidence that such an easement would be unsafe, it must be allowed. The statute, however, neither mandates nor prohibits an easement along the entire riverbank lying within the subdivision. To the contrary, the extent, width and character of the easement along the riverbank within the subdivision is to be defined by the local agency by considering the four factors set forth in the statute.

Our interpretation of the type of easement called for by section 66478.5 means that fishermen such as respondents herein will have a right of reasonable access to the Kern River from such portion of the riverbank within the subdivision, e.g., a foot trail along the riverbank that the local agency determines to be reasonable in extent, width and character. The fact that the river may be unsafe for swimming or boating during high water months (April, May and June) does not necessarily make a foot trail (or a bike or equestrian trail) at a reasonable distance above the high water mark along the riverbank unsafe for the public. Nor does the likelihood of trespass on private property alone (factor No. 4) permit the local agency to limit the easement to land outside the subdivision. If this were so, the easement required by section 66478.5 would be nonexistent since appellant owns all of the property along the river inside the subdivision.

The peremptory writ should be amended to direct the city not to approve any further development of the subdivision until the map provides for the dedication of a reasonable public easement along the riverbank bordering or lying within the subdivision.

III. *Did the trial court abuse its discretion in awarding attorney's fees?*

Respondents were awarded $64,000 in attorney's fees under the "private attorney general" doctrine codified in Code of Civil Procedure section 1021.5.[6]

---

[6]Code of Civil Procedure section 1021.5 reads: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

■ Appellants argue that the attorney's fee award is an abuse of discretion because Mr. Fallgatter, one of respondents' attorneys, appeared before the city council as a private citizen and urged the approval of the subdivision. Mr. Fallgatter was a member of the planning commission that initially rejected the subdivision for inadequate river access. He opposed the overall Kern River Access Plan because he thought it would allow complete development of the area while effectively giving up all access above the Rancheria Road easement. When he appeared before the city council, he expressly spoke as a private citizen. In the attempt to gain leverage for opposition to the Kern River Access Plan, he advocated acceptance of the subdivision and did not understand the requirement for access to the part of the riverbank "within or bordering on" the subdivision until later. He then organized the respondent Kern River Public Access Committee and coordinated the group of attorneys who handled the case for respondents. Appellants do not contend that he intentionally "set up" the city.

Mr. Fallgatter's statements of opinion as a private citizen are distinguishable from his actions as an attorney for respondents. While the personal expression of an ill-founded legal opinion to the city council should cause Fallgatter some personal embarrassment, it should not affect his clients' case.

■ The purpose of the private attorney general doctrine codified in Code of Civil Procedure section 1021.5 is "to encourage suits effectuating a strong [public] policy." (*Serrano* v. *Priest* (1977) 20 Cal.3d 25, 43 [141 Cal.Rptr. 315, 569 P.2d 1303]; *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].) This purpose is advanced by the award in this case. The Legislature has expressed its intent to implement and extend the state constitutional right of access to the rivers of California. (§§ 66478.1, 66478.2, 66478.3.) When a local agency, like the city in this case, fails to enforce this law, private suits like this one are the only practical way to effectuate the policy, so attorney's fee awards are appropriate. ■ An attorney's mistaken expression of opinion, as a private citizen, should not disqualify him from further participation in the process or affect his client's right to an award of attorney's fees.

■ Appellants also contend that the judgment does not confer any "significant benefit" on the public. Their argument is that the litigation resulted in a net loss to the public because local agencies are "now precluded from negotiating for alternative reasonable access outside the subdivision," and the alternative access negotiated in this case involved more river frontage than the subdivision itself contains.

Appellants' arguments are specious. Although the judgment requires reasonable public access to the banks of the river "within" the subdivision, it does not "preclude" any negotiations with the developer about additional offsite access. Under the statute, the city could conceivably demand an easement across the subdivision and a large easement along the riverbank within the tract.

Appellants' claim that a plaintiff's failure to object to the acts of public officials before filing a lawsuit forecloses the right to claim attorney's fees in the suit is misplaced. Here, it was not the public, the plaintiff, but Mr. Fallgatter in his capacity as a private citizen who failed to object to the council action in opposing the subdivision without compliance with the law. It was obvious that the city council was not going to change its position. It had taken a position favoring the developer and opposing increased public access to the riverbank. After its approval of the alternate offsite easements, an attempt to return to that forum for relief would have been a futile gesture.

Appellants' complaints about the negative effect of the judgment are exaggerated. On the positive side, there has been an examination and enforcement of the public's right of access to the Kern River's banks within the subdivision. This will establish a precedent for future development along the Kern River. Now that it has been appealed, this case will have a significant benefit of clarifying the law statewide. In addition, the city council will be ordered to comply with the law by making appropriate findings on the safety aspect of the public easement. In *Woodland Hills Residents Assn., Inc. v. City Council, supra,* 23 Cal.3d 917, 939-941, the Supreme Court recognized that forcing a city council to comply with the Subdivision Map Act by making proper findings could be a "significant benefit" and presented a factual issue to the trial court. Here, the trial court has determined that factual issue in its award of attorney's fees. Appellants have not presented any reason why we should overturn that implicit factual finding.

Appellants also contend that the hours spent by respondents' attorneys were not adequately documented. The attorneys each submitted an affidavit showing the number of hours spent. They were available for cross-examination, but were not called by appellants. Appellants contend, without citing relevant authority, that the trial court should have rejected these affidavits. It is too late to attack the documentation on appeal when we are given no reason to disbelieve the affidavits. It is irrelevant that not all of the attorneys appeared in court when their work was done on the briefs and documents.

Finally, the trial court justified its addition of 50 percent to the hourly figure by pointing to the complexity of the litigation. It failed to explicitly run through all of the factors that are relevant to such calculations.

 The California Supreme Court has summarized the relevant factors from *Serrano* v. *Priest, supra,* 20 Cal.3d 25 (*Serrano III*). Some of these factors "may" be used and others are "required."

"*Serrano III* requires the trial court to first determine a 'touchstone' or 'lodestar' figure based on a 'careful compilation of the time spent and reasonable hourly compensation for each attorney . . . involved in the presentation of the case.' (20 Cal.3d at p. 48; *Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 625 . . . (*Serrano IV*).) That figure may then be increased or reduced by the application of a 'multiplier' after the trial court has considered other factors concerning the lawsuit.[12]

"The proper determination and use of the lodestar figure is extremely important. As this court noted in *Serrano III,* ' "The starting point of every fee award . . . must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts." ' [Citation.]

"Ultimately, the trial judge has discretion to determine 'the value of professional services rendered in his [or her] court . . . .' (*Serrano III, supra,* 20 Cal.3d at p. 49.) However, since determination of the lodestar figures is so '[f]undamental' to calculating the amount of the award, the exercise of that discretion must be based on the lodestar adjustment method. [Citations.]"

 Appellants' complaint is that some of the factors that "may" be considered were not explicitly discussed. This omission, if it matters at all, does not make the award unreasonable. Using the respondents' claimed $42,000 plus a "lodestar" amount, increasing by 50 percent the award to $64,000 is comparable, in effect, to 40 percent and 100 percent increases approved in *Press* v. *Lucky Stores, Inc., supra,* 34 Cal.3d at page 324. This

---

[12]*Serrano III* set forth a number of factors the trial court may consider in adjusting the lodestar figure. These include: '(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; [and] (6) the fact that the monies awarded would inure not to the benefit of the attorneys involved but the organizations by which they are employed.' " (*Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322 [193 Cal.Rptr. 900, 667 P.2d 704].)

is a relatively complex matter where success was not assured and where the appellants fought the case at every turn. We cannot reverse the award as an "abuse of discretion" in this context.

The trial court is directed to amend the judgment to provide "for dedication of a reasonable public easement along the bank of the river which borders or lies within the tract 4179A," consistent with the views expressed in this opinion. As amended, the judgment is affirmed in all other respects.

Ivey, J.,* concurred.

**WOOLPERT, J.**—I respectfully dissent. My dissent finds no clarity in the pertinent parts of the applicable sections of law, and seeks to resolve the uncertainties by reference to some of the guidelines used by the majority and others.

We deal with the right of the public to use the navigable streams of this state. The right is in the nature of a privilege jealously guarded by the California Constitution (Cal. Const., art. X, §§ 3, 4; formerly art. XV, § 2). Thus, "[H]unting of wild game . . . is a privilege which is incidental to the public right of navigation. There is no private property right in wild game. The wild animal or bird, not in captivity nor tamed, becomes the property of him who takes or kills it. Any person has the right to take and kill such wild birds or other game in any place where he may find them. He has no lawful right to trespass on the premises of another for that purpose. But wherever he may lawfully go, he may take and kill such game as he may find there, subject, of course, to the restrictions of the game laws." (*Forestier* v. *Johnson* (1912) 164 Cal. 24, 40 [127 P. 156].)

The public trust rights, often defined in terms of navigation, commerce and fisheries, "have been held to include the right to fish, hunt, bathe, swim, to use for boating and general recreation purposes the navigable waters of the state, and to use the bottom of the navigable waters for anchoring, standing, or other purposes." (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 259 [98 Cal.Rptr. 790, 491 P.2d 374].)

The extent of the public ownership and trust depends upon the nature of the waterway. If tidelands, the public owns the land "in trust" between the lines of mean high tide and mean low tide, but if "shoreline" along nontidal navigable lakes and streams, the private property extends to the "low water mark." However, the private ownership of the land between the high and

---

*Assigned by the Chairperson of the Judicial Council.

low water marks is subject to the same public trust incidents applicable to tidelands. The private owners may use the privately owned shoreline "in any manner not incompatible with the public's interest in the property." (*State of California* v. *Superior Court (Lyon)* (1981) 29 Cal.3d 210, 232 [172 Cal.Rptr. 696, 625 P.2d 239].)

For over 100 years our state Constitution has contained the *same* protective language: "Sec. 4. No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof." (Cal. Const., art. X, § 4.)

As indicated in *Forestier* in 1912, once the public right is clear, its exercise is a free one, subject to game laws or other reasonable police power restrictions consistent with the right. It has been found that an ordinance prohibiting all rafting and boating on about 20 miles of a river is unconstitutional. "However laudable its purpose, the exercise of police power may not extend to total prohibition of activity not otherwise unlawful." (*People* ex rel. *Younger* v. *County of El Dorado* (1979) 96 Cal.App.3d 403, 406 [157 Cal.Rptr. 815].) However, it has also been held that "[i]t is a political question, within the wisdom and power of the Legislature, acting within the scope of its duties as trustee, to determine whether public trust uses should be modified or extinguished (see *City of Long Beach* v. *Mansell* [1970] 3 Cal.3d at p. 482, fn. 17 [91 Cal.Rptr. 23, 476 P.2d 423]), and to take the necessary steps to free them from such burden. In the absence of state or federal action the court may not bar members of the public from lawfully asserting or exercising public trust rights on these privately owned tidelands." (*Marks* v. *Whitney, supra,* 6 Cal.3d at pp. 260-261.)

Our decision will affect substantial rights. There are some 4,000 miles of shoreline along 34 navigable lakes and 31 navigable rivers. "[T]he shorezone has been reduced to a fraction of its original size in this state by the pressures of development." (*State of California* v. *Superior Court (Fogerty)* (1981) 29 Cal.3d 240, 245 [172 Cal.Rptr. 713, 625 P.2d 256].)

It is evident that continued increases in the state population have caused a more conservationist flavor to the high court's discussion of these constitutional privileges. I compare the language of *Forestier,* quoted above, with that of more recent cases. In *Marks,* the 1971 court observed: "The public

uses to which tidelands are subject are sufficiently flexible to encompass changing public needs. In administering the trust the state is not burdened with an outmoded classification favoring one mode of utilization over another. (*Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.*, 67 Cal.2d 408, 421-422 [62 Cal.Rptr. 401, 432 P.2d 3].) There is a growing public recognition that one of the most important public uses of the tidelands—a use encompassed within the tidelands trust—is the preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area. It is not necessary to here define precisely all the public uses which encumber tidelands." (*Marks* v. *Whitney, supra,* 6 Cal.3d at pp. 259-260.)

More recently, in 1981, the court used the same language when describing the importance of the shorezone.

"The shorezone is a fragile and complex resource. It provides the environment necessary for the survival of numerous types of fish (including salmon, steelhead and striped bass), birds (such as the endangered species: the bald eagle and the peregrine falcon), and many other species of wildlife and plants. These areas are ideally suited for scientific study, since they provide a gene pool for the preservation of biological diversity. In addition, the shorezone in its natural condition is essential to the maintenance of good water quality, and the vegetation acts as a buffer against floods and erosion.

"The close relationship of the life forms in the shorezone to one another and to the condition of the bed of the stream or lake, the delicate balance among them, and the adverse effects of reclamation and development of these areas have been documented in numerous studies and reports. . . ." (*State of California* v. *Superior Court (Fogerty), supra,* 29 Cal.3d at p. 245.)

The *Fogerty* court concluded: "The exercise of the police power has proved insufficient to protect the shorezone. The urgent need to prevent deterioration and disappearance of this fragile resource provides ample justification for our conclusion that the People may not be estopped from asserting the rights of the public in those lands." (*Id.,* at p. 247.)

Therefore, the city was not to be concerned with only the right to enter to shoot waterfowl or to land fish. The city had a duty to observe all the constitutional, statutory and judicial guidelines and restrictions, with the difficult task of accommodating the ever-increasing conflicting demands and

needs of people and places. Priority cannot be given one purpose to the detriment of another.

Examples come to mind of the failure of the police power to protect natural resources when there is unlimited public access. Who can find a Pismo clam at Pismo Beach? Where are the once plentiful abalone? Some will say the otter is the culprit. However, clams and abalone thrived along with the otter until people, making unimpeded use of the beaches at low tide, turned the plenty of the postdepression years to the nothing of the present. Only 200 years ago the state wildlife fed many native people, and almost overnight herds of elk and antelope, and other forms of wildlife, became extinct. The police powers belatedly exercised in the form of licensing and game limits failed to protect wildlife in terms of numbers, and even kind. Indeed, licensing on a nondiscriminatory basis may endanger plant life along the shoreline if free access is permitted along much of its length.

A practical distinction must be kept in mind. Along beaches there is a wide band of traversible sand and rock, except at high tide. Public access is concerned only with getting to the beaches. No easement along the private frontage is necessary. In contrast, natural lakes tend to have only slight tides, and rise and fall only with seasonal water from the watershed. However, even in the case of lakes, the Legislature has *not* provided for a *mandatory* easement along the water frontage. Instead, other provisions of the law, optional with the local agency, may be used to require the dedication of areas within a subdivision for parks, recreational facilities, etc. (Gov. Code, § 66479.) This *option* is available if private property is subdivided along navigable streams.

In further contrast, the provisions we construe today relating to streams and rivers apply to waterways in which there is little or no strip of land between high and low waters. Therefore, the public right to traverse the edge of the waterway may be of little practical purpose without an adjacent dedicated easement. Thus, it is important that such easements be obtained whenever the public trust reasonably demands a grant in favor of the public and in limitation of the potentially destructive private uses of the future. We all agree on this subject.

Our entire written law is concerned with the importance of diligently protecting the public trust in *all* its aspects. Numerous statutes seek to provide protection of natural resources. For example, the Wild and Scenic Rivers Act contains this legislative declaration: "It is the policy of the State of California that certain rivers which possess extraordinary scenic, recre-

ational, fishery, or wildlife values shall be preserved in their free-flowing state, together with their immediate environments, for the benefit and enjoyment of the people of the state." (Pub. Resources Code, § 5093.50.) One person's favorite form of recreation need not be encouraged by a paper easement if its exercise would endanger the environment, or another, more reasonable trust interest. Just as the hunter's shotgun may upset the fisherman's solitude, the boots of both may destroy the native plant life. An easement in the wrong place may encourage unreasonable access to accomplish the user's goal. The private landowner whose frontage is subjected to the public easement is not required to improve the route. (Gov. Code, § 66478.14.) Must the local agency obtain a shoreline easement to make fishing or hunting appear possible when the land in its natural condition is inaccessible? Must someone clear a path? The majority seems to indicate an easement must be obtained unless the personal safety of the fisherman or hunter would be risked. If the nature of the entire shoreline of the subdivision makes all public uses impracticable, must the local agency disregard that fact and obtain a right of way? Must public funds be used to assure that the ecology is not disturbed by those wishing to use the mandated easement? The majority suggests easements must be obtained, but does not address questions of compatibility and relative utility.

The discussion so far has been one of what *must* the local public agency require of the subdivider. Without question, ample authority permits the setting of reasonable conditions to the approval of subdivision maps, including the dedication of private land to certain public uses. However, the issue is not whether such policy determinations *can* be made. In its most simple terms, the issue is whether the Legislature in its ambiguous language meant to mandate that a public easement must be dedicated in the case of every subdivision, with safety being the sole exception. The answer is not to be found in whether one favors fishing, hunting or swimming. Likewise, the answer probably does not find itself in an overemphasis of an "ecology" point of view. The answer lies in the statutory use of the word "reasonable."

The constitutional protection is of the "right of way to such water whenever it is required for any public purpose . . . and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof." (Cal. Const., art. X, § 4.) The subject matter of the constitutional provision is the access to the *water*. The shoreline is not made private property, although it may be subject to the public trust.

Sections 66478.1 through 66478.10 of the Government Code were enacted to carry out the *constitutional* directive to insure continued public access

to the water. The Legislature has spoken of increased public access to *public natural resources* as the goal. (Gov. Code, § 66478.3.) The public access takes two forms. The first obvious one is a route from public property to the shoreline fronting the waterway. (Gov. Code, § 66478.4.) The second form of access, along the shoreline, is termed a "public easement." Whether called an "easement," as found in section 66478.5, or "public access by fee or easement" as it appears in section 66478.4, at this point the precise terminology is unimportant. Both the route *to* the shoreline, and thus to the water, and the route *along* a portion of the shoreline, to enjoy the water and shoreline, are to be determined by the *same* criteria. And even then, the pertinent sections make frequent use of the word "reasonable."

In its ambiguous language, section 66478.5 speaks of an easement "along a portion of the bank of the river or stream. . . ." Does the word "portion" limit the length or the width of the easement, or both? I agree with the majority that it is not necessary to acquire an easement along the entire length of the shoreline if that would be unreasonable. The next sentence in the section states: "The extent, width and character of the public easement shall be *reasonably* defined to achieve *reasonable* public use of the public waterway river or stream consistent with public safety." (Italics added.) When using the word "extent" in contrast to "width and character," the fair conclusion is that the word "extent" is either synonymous with "length," or at the very least, includes length. Therefore, the local agency must seek *reasonable* access to the shoreline, and thus to the water, and *reasonable* access along the shoreline. The nature and extent of that access also depends upon an effort to reasonably accommodate the public and private interests in the shoreline, risk of trespassing on the adjacent private property being one of the statutory criteria.

The next section disclaims any intent to limit any powers or duties of other public agencies. Immediately following, there appears another ambiguously written section—66478.8. Of considerable importance, section 66478.8 commences with: "Nothing in Section 66478.1 through 66478.10 of this article shall require a local agency to disapprove either a tentative or final map solely on the basis that the reasonable public access otherwise required by this article is not provided through or across the subdivision itself. . . ." The easement exception requires a finding that "such reasonable public access is otherwise available within a reasonable distance from the subdivision." Contrary to the majority position, section 66478.8 does not read in terms of alternatives to the "access *to*" the riverbank. The reference is to "reasonable public access otherwise required by this article. . . ."

The words "public access" appear frequently in the sections incorporated in section 66478.8. Because the form of "public access" may be by fee or easement (§ 66478.4), it is not likely that the Legislature intended to use the ambiguous language in sections 66478.5 and 66478.8 in any narrow sense which would make the exception apply only to the route to the shoreline and not to the route along the shoreline. Each easement serves the same purpose: providing access to the waterway and its shoreline.

In searching the legislative history of the sections, one finds further ambiguous statements. Counsel have provided us with various legislative points of view, including legislative committee reports, the digest of Legislative Counsel, and even the Attorney General's recommendation to the Governor that the bill be given favorable consideration, protecting as it does the "principle of home rule and flexibility in local application by providing that the local governing body shall implement its provisions, and determine the reasonableness of the public access provided." The language of the legislative committees predating the Legislative Counsel's Digest is far from conclusive.

Counsel have also referred to comments from two state department heads. However, each department head follows the approach of Legislative Counsel by combining the two kinds of public access (entry and along the shoreline) and then noting the "public access" may be accomplished through nearby property. The majority view that this is an erroneous statement disregards the probability that it more reasonably interprets the section than the alternative of requiring a shoreline easement even when reasonable public uses are not foreseeable.

The majority cites this court's *California Teachers' Assn. v. Governing Board* (1983) 141 Cal.App.3d 606 [190 Cal.Rptr. 453], for the proposition that if the digest of Legislative Counsel conflicts with the statute, it must be disregarded. However, the case tells us more. We are to disregard the digest when the conflicting language of the statute is *clear.* This is so because when statutory language is clear there is no room for judicial interpretation. Because this language is most uncertain, and the majority spends some time in finding it so, "it is appropriate to examine the digest in order to ascertain legislative intent." (*Id.,* at p. 613.) Appellate courts are well aware that proposed bills are regularly accompanied by a Legislative Digest. Presumably the legislators and Governor consider the digest when reading and approving the legislation.

When language is used which at some length ambiguously provides for a course of action, and an alternative would have been easily phrased, appel-

late courts are reluctant to overlook that fact: "If the Legislature had desired to require . . ., it could have done so simply and unambiguously." (*Id.*, at p. 615.)

It is not necessary to rely on Legislative Counsel in this case. The broad provision of section 66478.8 and its incorporation of section 66478.5 (as further explained by § 66478.4 in its reference to public access as being by fee or easement), makes it most likely it was intended that the public agency may accept alternate entry routes and shoreline access. This does not mean that it must do so; to the contrary, in many cases that would be poor judgment as it may require further action to obtain access when conditions change. Public funds might be involved at that time. It does mean that the Legislature has not demanded that local agencies always obtain shoreline easements, irrespective of surrounding circumstances and conditions.

Section 66478.5 *requires* that the agency consider potential trespass upon the adjacent private property. The majority gives little attention to that consideration. The risk of trespass may far outweigh the public benefit of entry and use of some shorelines. Increasing access elsewhere may justify limiting or waiving access in another location.

The majority considers the city action in this case to be "ironic." To the contrary, it may have been realistic in its approach to area-wide planning instead of merely focusing on artificial property lines. Absurd results may follow if property lines become the major consideration. There may be numerous small property owners near a larger property ownership. Some may not wish to subdivide. Many may not be able to subdivide, for financial or topographic reasons. Others may wish to subdivide, but not want to risk trespassers after the shoreline is opened to public access. A few may purposely subdivide nearby property, but not land adjacent to the waterway. It may be reasonable to encourage the use of a single point of entry, and *all* of the shoreline, thus avoiding several points of entry. Or, if the shoreline of the property to be subdivided is rough and impractical for any real use, and the public uses are therefore minimal, the agency may seek to gain extra easements in nondivided property retained by the owner, as in this case. Numerous variations of such circumstances are possible and no doubt could not be legislatively solved in advance.

To require an easement along the shoreline within the subdivision itself may defeat reasonable negotiations. Thus, although the city in this case did not require easements within the subject property, it may not have acted contrary to the public interest when it obtained easements elsewhere. We are not in a position to say that the result was contrary to the public interest.

The trial court avoided resolving this question when it determined the city lacked such discretion.

If the city had required an entry route to a telephone-booth-sized shoreline easement, this court would be concerned unless, of course, no other reasonable course of action was available. Even an observation platform may serve a public benefit where other forms of public enjoyment are impossible. A reviewing court should always look to the surrounding facts before substituting its judgment for that of the agency.

Because the trial court has misapplied the law, the attorney fee award is cast in doubt. I would reverse the judgment and remand for further proceedings consistent with the views expressed herein.

The petitions of defendant and appellant and real party in interest and appellant for review by the Supreme Court were denied October 31, 1985.