[Nos. D056652, D056648. Fourth Dist., Div. One. May 25, 2010.]

CENTER FOR BIOLOGICAL DIVERSITY et al., Plaintiffs and Respondents, v.
COUNTY OF SAN BERNARDINO, Defendant;
NURSERY PRODUCTS, LLC, Real Party in Interest and Appellant.

870

COUNSEL

Brownstein Hyatt Farber Schreck, Lisabeth D. Rothman, Timothy H. Irons and Kari Nieblas Vozenilek for Real Party in Interest and Appellant.

Environmental Law & Justice Clinic, Helen Kang, Lucas Williams; Center on Race, Poverty & the Environment, Ingrid Brostrom, Brent Newell; Law Office of Richard M. Pearl and Richard M. Pearl for Plaintiffs and Respondents.

OPINION

**McCONNELL, P. J.**—The Center for Biological Diversity and Helphinkley .org (together Helphinkley) successfully challenged the County of San Bernardino's (the County) approval of an open-air human waste composting facility, under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), and subsequently obtained an order of attorney fees under the private attorney general statute (Code Civ. Proc., § 1021.5). Nursery Products, LLC (Nursery Products), the proponent of the project and real party in interest, contends the trial court erred by decertifying the final environmental impact report (FEIR) for the project on the grounds it did not adequately (1) analyze the feasibility of an enclosed composting facility as an alternative to an open-air facility, or (2) address the issue of water supply for the facility. As to the latter issue, the court determined the proposed project was subject to Water Code section 10910, which requires either the public water system that may provide water for the project, or the city or county when no public water system is identified, to prepare a water supply assessment (WSA) that

analyzes whether there are sufficient water supplies for the project. Nursery Products also contends that for a variety of reasons the court abused its discretion by awarding Helphinkley attorney fees under Code of Civil Procedure section 1021.5. We affirm the judgment and the order, and remand for a determination of attorney fees on appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

We draw the facts from the record before the County's Board of Supervisors (Board) when it took the challenged action. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 421 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).)

### *Proposed Project*

Nursery Products proposes to develop and operate a project referred to as the "Hawes Composting Facility" (Hawes Project), which "would compost biosolids [derived from human waste] and green material [derived from plants] to produce agricultural grade compost." The organic materials used in compost, and the product's water retention properties, "can improve the agricultural productivity of arid desert soils." Compost can "also be used in nursery and landscaping operations, erosion control, and similar uses in developing areas." The Inland Empire area, including San Bernardino and Riverside Counties, annually produces more than "219,000 dry metric tons of biosolids," and it is "estimated that currently, about 88% of the biosolids generated in Southern California is being trucked to Arizona and the Central Valley (primarily Kern and Kings County) for disposal in landfills or land application." The proposed project would receive a daily average of 1,100 tons of raw materials, or approximately 400,000 tons annually. It "would have the capacity to compost approximately 200,000 tons per year (182,000 metric tons) of biosolids, and thus could serve the needs of most of the Inland Empire region."

The proposed site is an undeveloped 160-acre parcel in the Mojave Desert, within an unincorporated area of San Bernardino County. A residence is located one and one-half miles from the site, and another residence is located two and one-half miles from the site. The next nearest homes are in the town of Hinkley, which is eight miles from the site.

The proposed Hawes Project is an open-air facility. Nursery Products intends to "use a combination of windrow and modified static pile composting methodologies." The windrow method "uses mechanical turning of the

composting piles to provide control of oxygen, moisture, and other parameters to maintain and control the composting process." The static pile method "require[s] a forced air and/or vacuum system to pull air through piles of compost material."

The facility would operate 365 days per year, 24 hours per day. It would receive an average of 48 truckloads of materials per day, increasing to an average of 87 truckloads on peak days. The facility would include an office space of approximately 720 square feet, and areas for parking; a scale; screening and finished product storage; and a 2,000-gallon, double-walled, above-ground diesel fuel tank. The proposed site has no utilities, and the facility would use chemical toilets, cellular phone service, and electricity from a portable diesel-fueled generator and solar equipment.

### CEQA Documents

The County is the lead agency directing the environmental review of the proposed Hawes Project under CEQA. The County's May 2006 initial study found the project would potentially affect several environmental factors, including cultural resources, biological resources, hazardous materials planning, hydrology and water quality, and air quality. Thus, the County was required to prepare an environmental impact report (EIR). Here, we are concerned with the sufficiency of the County's environmental review as to the factors of air quality and the source of water supply.

### A. Air Quality

In September 2006 the County circulated a draft EIR (DEIR) for public comment. The DEIR concludes that even after implementation of feasible mitigation measures, an open-air composting facility would have a significant adverse impact on air quality in a region already suffering from air pollution. The DEIR states: "Among the compounds regulated as toxic air contaminants by the State of California, [are] two substances, hydrogen sulfide . . . and ammonia, [which] are known to be emitted by composting facilities, specifically, from active windrow composting." The DEIR also notes the "operational VOC emissions [ozone precursors] from the Project would exceed the MDAQMD [(Mojave Desert Air Quality Management District)] daily and annual emissions thresholds."

The DEIR evaluates three "project specific alternatives" to the proposed Hawes Project, as follows: (1) the statutorily mandated no project alternative, (2) a reduced capacity alternative, and (3) an alternative site at Fort Cady. The DEIR concludes that all three alternatives are potentially feasible.

The DEIR does not include an enclosed composting facility as a feasible alternative. The DEIR acknowledges that "an enclosed composting facility in which all the compost and resulting emissions are contained within a building and [forcibly] aerated during curing [is] estimated to reduce VOC and ammonia emissions by 80%." Even with that reduction, however, "VOCs emissions are estimated to be 71 tons/year and would still exceed the significance threshold of 25 tons/year."

The DEIR explains that "[w]hile providing state of the art material and odor control, [an enclosed] system is very expensive"; "the electricity needed to power the conveyors and airflow systems can be substantial"; and "[t]he equipment and operations to implement in-vessel facilities are more extensive." Further, it states the "particular approach proposed by Nursery Products—open windrows—has the advantage of being relatively less expensive." The DEIR discusses an enclosed facility the Inland Empire Utility Agency was developing in Rancho Cucamonga, which is also in San Bernardino County. The DEIR states that facility "is over $60 million . . . , which is about twice the original estimate for the building and equipment."

The State Department of Health Care Services objected to the DEIR, stating that "[e]nclosed facilities, such as those operating in Los Angeles and Riverside Counties and throughout the country, have been shown to be effective in controlling emissions (VOC's, pathogens, bioaresols [sic], dust, odors)." The County also received numerous complaints from community members about the proposed project's effect on air quality, and the superiority of an enclosed facility. Center for Biological Diversity, a respondent here, complained that the DEIR "completely fails to address building an enclosed composting facility either on this site or close to the sewage treatment plants rather than trucking the sludge out to the proposed site and significantly impacting the air quality . . . with the plant's operations and truck emissions."

In November 2006 the County issued its FEIR. The FEIR rejects the alternative of an enclosed facility as financially and technologically infeasible, and thus the alternative was not "evaluated in detail." As to economic infeasibility, the FEIR appears to rely exclusively on a memorandum by Geoffrey Swett, of the environmental consulting firm Arcadis G&M, Inc. The memorandum states: "Capital costs for outdoor facilities are relatively modest, typically $2–3 million for a facility to accommodate a 400,000 ton per year facility. [¶] Capital costs for indoor facilities are significantly larger. The Inland Empire Regional Composting Facility, which is currently being constructed in Rancho Cucamonga, has an estimated capital cost of $62.5 million as of the spring of 2006. This facility will have a capacity of 300,000 tons per year. [¶] Extrapolating those costs for the 400,000 ton/year Hawes field site results in an estimated capital cost of $83.3 million. This is

about 28–41 times the cost of a conventional facility and would make the Hawes project uneconomic and impractical." (Fn. omitted.)

The Swett memorandum states the typical operating costs for an open-air facility are $8 per ton. Further: "[O]perating costs are an insignificant cost component for outdoor sites. Indoor sites have significant operating costs, including the following key components: [¶] Electricity—Huge air fans are needed to circulate air through the compost and biofilters. Each of these air ducts [is] 4–8 feet in diameter and there are numerous ducts. [¶] Maintenance and repair—All of the air handling equipment must be maintained and repaired. Typically this amounts to an annual cost of about five percent of mechanical equipment capital cost. [¶] Operator supervision—Managing an indoor composting facility requires staff to manage air flows and operating conditions in the biofilters. [¶] We conservatively estimate the additional operating and maintenance cost to be $5.00/ton. This represents a cost increase of 62.5 percent over an open air site."

The Swett memorandum also states that "Nursery Products['s] primary competitors are open air facilities in Kern County and Arizona. It does not compete with facilities such as the Inland Empire Regional Composting Facility which is owned by two wastewater agencies for managing their own biosolids. Therefore to be economically viable, Nursery Products must have a capital cost roughly equivalent to those facilities in Kern County or Arizona."

Additionally, the Swett memorandum discusses the availability of financing to a private party such as Nursery Products for the development of an enclosed composting facility: "The Inland Empire Regional Composting Facility is a first of its kind facility and requires sophisticated systems to properly operate and ensure it does not adversely impact neighbors. Frankly this is the type of risk that a private composting firm typically can not [sic] accept. Private financing for such a risky proposition would not be available. [¶] New technology not only poses a technology risk, but it also poses a capital cost escalation risk. The Inland Empire Regional Composting Facility has experienced significant capital cost escalation. In September 2002, the estimated capital cost was $30 million. Further it was projected that the facility could begin operating in December of 2004. [¶] In the spring of 2006, the cost had risen to $62.5 million and the facility was projected to be completed in the summer of 2006. In May 2006, the projected completion date was July 21, 2006. In July 2006, the completion date was estimated to be October 1, 2006." As of November 1, the project was not completed. The memorandum pointed out that "construction delays increase capital costs. At a minimum, six percent interest on capital invested will add $300,000/month to the total project cost." (Fn. omitted.)

The FEIR essentially repeats Swett's statements as to economic infeasibility. As to technological infeasibility, the FEIR states: "[E]nclosed composting . . . involves construction of an extremely large enclosure. The proposed Project site is not currently served by any electricity provider, and there are no electric lines within one mile of the site. Nor is other infrastructure necessary for construction of a large building currently present."

## B. *Water Supply*

The Mojave Desert, the proposed site of the composting facility, "is the driest desert in the continental United States with precipitation ranging from 2.23 to 2.5 inches per year, with much of the rain falling October to March and temperatures ranging from 40 to 110 [degrees Fahrenheit]." The site is located within the "regional Mojave River groundwater basin," and the "region relies almost entirely on groundwater for its water supply, which has resulted in increased depths to groundwater due to groundwater extraction (overdraft conditions)."

Information in the DEIR pertaining to water supply is sparse. It states the proposed Hawes Project "will use either groundwater from a well or imported water, or a combination of both. The facility would use approximately 1,000 gallons per day. Most of the water would be used for dust control."

Many citizens voiced concerns about the DEIR's cursory analysis of water demand and supply for the proposed project. For instance, a letter stated: "It is never mentioned where the water for the sludge facility is coming from. A well is mentioned but if a well is not feasible where will Nursery Products get the water?" Another letter noted the proposed project would need water for purposes other than dust suppression, such as fire fighting and sanitation for employees. The City of Barstow wrote that "a considerable amount of water may be necessary to suppress any potential fires," and the "Mojave Water Agency should be consulted." The Mojave Water Agency wrote: "The DEIR does not discuss the water supply required for the project. It has been represented that the project would require about 1,000 gallons per day which, if this is correct, would equate to slightly more than 1.10 acre-feet per year. This appears to be a relatively minor quantity of water for the scope of the project described, particularly considering the need to control fugitive dust."

In response to such comments, the FEIR states: "Water for operations will be provided by an on-site well or be purchased and stored or a combination of both. The water will be stored in a water truck with a 2,000 gallon capacity. As necessary, the water truck will be filled using the on-site well and/or purchased water."

The FEIR also states that before commencing business Nursery Products must provide the County with evidence that it can "maintain an adequate

water supply and delivery capacity," and it must "consult with the local fire agency to determine the . . . quantity of water to maintain on site."

The Mojave Water Agency's Board of Directors voted unanimously to oppose the proposed Hawes Project, in part because the FEIR does not address concerns the agency raised about the DEIR.

### Approval of Hawes Project and Helphinkley's Administrative Appeal

On November 30, 2006, the County's Planning Commission certified the FEIR as being in compliance with CEQA and approved a conditional use permit (CUP) for the project. The FEIR provided for a phased project with the initial phase not to exceed 80 acres of the 160-acre site. Before developing a subsequent phase, Nursery Products was required to demonstrate need.

Helphinkley appealed to the Board. On February 27, 2007, after a hearing, the Board approved the project with some modifications. The Board, for instance, conditioned expansion of the operation to more than 80 acres on Nursery Products's additional application and a public hearing.

### Petition for Writ of Mandate

In March 2007 Helphinkley filed a petition for writ of mandate and complaint (hereafter petition) against the County for violation of CEQA.[1] The petition alleges the FEIR fails to adequately analyze a variety of environmental factors, including air quality impacts; greenhouse gas emissions; protected species, specifically the desert tortoise and the Mojave ground squirrel; and cumulative impacts. The petition also alleges the FEIR does not adequately describe certain project details, including the proposed composting method, composting source material, and water sources and supply.

After a hearing on February 8, 2008, the court took the matter under submission. In an April 11, 2008 statement of decision, the court determined the FEIR's finding that the alternative of an enclosed composting facility is economically and technically infeasible is unsupported by substantial evidence. The court also found the FEIR does not adequately identify the source of water for the proposed Hawes Project. The court determined the proposed project is a "project" within the meaning of Water Code section 10912,

---

[1] The petition originally included counts for violation of the California Integrated Waste Management Act of 1989 (Pub. Resources Code, § 40000 et seq.) and the San Bernardino County Development Code, but they were dismissed without prejudice before trial.

subdivision (a)(5), and thus the FEIR must include a WSA under Water Code section 10910. The court rejected Helphinkley's other challenges to the FEIR.

The court issued a peremptory writ of mandate that requires the County to set aside the certification for the FEIR and all approvals for the project, including the CUP, and to comply with CEQA. The writ enjoins Nursery Products from proceeding with any aspect of the project "unless and until such time as the County has certified and adopted an EIR that complies with CEQA." Judgment was entered on June 23, 2008, with the court reserving the issue of attorney fees.

### Attorney Fees

In September 2008 Helphinkley moved for attorney fees under Code of Civil Procedure section 1021.5, the private attorney general statute. The court awarded it $265,715.55 in fees. We discuss the attorney fees issue in greater detail below.

### DISCUSSION

### I

### Motion to Dismiss

Preliminarily, we dispose of Helphinkley's motion to dismiss the appeals on the grounds of mootness and lack of standing.

The County has not appealed either the judgment or the attorney fees order. In its August 22, 2008 return to the peremptory writ of mandate, the County advised the court that it was "moving forward to perform the additional environmental analysis" the court directed, and its Board had approved a request for proposals to solicit consultants to assist with the drafting of a supplemental environmental impact report (SEIR). The County anticipated that a consultant would begin work in November 2008, and proceedings on the SEIR would conclude in August or September 2009. In support of its motion to dismiss, Helphinkley has submitted the County's July 27, 2009 notification that a draft SEIR was available for public review and comment, with the comment period ending September 13, 2009.[2]

■ Helphinkley's theory is that since the County is voluntarily complying with the writ of mandate, this court cannot grant any effective relief from

---

[2] We grant Helphinkley's November 2, 2009 request for judicial notice of this document. (Evid. Code, § 452, subd. (c).) We also grant Nursery Products's November 17, 2009 request for judicial notice of another document of the County pertaining to the SEIR. (*Ibid.*)

the judgment, and "this case would be moot, but for the fees appeal." "An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief." (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054–1055 [81 Cal.Rptr.3d 556].) Helphinkley acknowledges that if the appeal of the order on fees is not subject to dismissal, neither is the appeal of the judgment on which the fees award rests. (See *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750–1751 [12 Cal.Rptr.2d 308].)

■ Helphinkley asserts Nursery Products lacks standing to appeal the order on fees since they were imposed only against the County. "Any party aggrieved" may appeal an adverse judgment or order. (Code Civ. Proc., § 902.) A party is aggrieved when the judgment or order "has an immediate, pecuniary, and substantial effect on his interests or rights." (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1342 [100 Cal.Rptr.2d 446].) Nursery Products is aggrieved by the order on fees because it entered into a written indemnity agreement under which it is required to reimburse the County for any attorney fees it incurs in a legal action arising from the proposed project. (See *id.* at pp. 1342–1343.) Accordingly, the motion to dismiss lacks merit.[3]

## II

### *Standard of Review*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard, supra,* 40 Cal.4th at p. 426, fn. omitted.)

" ' "Substantial evidence is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' " ' " (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 596 [54 Cal.Rptr.3d 366].) " 'In determining whether substantial evidence supports a finding, the court may not reconsider or reevaluate the evidence presented to the administrative agency. [Citation.] All

---

[3] Given our conclusion, we are not required to address Nursery Products's assertion that the appeal of the judgment is not moot for the additional reason that the record does not establish the County has fully satisfied the writ conditions.

conflicts in the evidence and any reasonable doubts must be resolved in favor of the agency's findings and decision. [Citation.] [¶] In applying that standard, rather than the less deferential independent judgment test, "the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." ' " (*Ibid.*; see Cal. Code Regs., tit. 14, § 15384.)[4]

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard, supra,* 40 Cal.4th at p. 427.)

### III

*Adequacy of FEIR's Enclosed Facility Analysis*

### A

Nursery Products contends the FEIR's finding that an enclosed composting facility is an economically and technically infeasible alternative to an open-air facility is supported by substantial evidence in the administrative record, and thus the court erred by granting Helphinkley writ relief on that issue. We conclude the contention lacks merit.

"The fundamental purpose of an EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment.' [Citation.] To that end, the EIR 'shall include a detailed statement setting forth . . . [¶] . . . [a]ll significant effects on the environment of the proposed project.' " (*Vineyard, supra,* 40 Cal.4th at p. 428.) "To facilitate CEQA's informational role, the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions." (*Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029].) "An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 405 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).)

"An EIR must 'describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of

---

[4] CEQA Guidelines, promulgated by the state's Resources Agency under Public Resources Code section 21083, appear at California Code of Regulations, title 14, section 15000 et seq. "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard, supra,* 40 Cal.4th at p. 428, fn. 5.)

the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives.' [Citation.] It must contain 'sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison with the proposed project.' [Citation.] 'The statutory requirements for consideration of alternatives must be judged against a rule of reason.' " (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1400 [133 Cal.Rptr.2d 718]; see Cal. Code Regs., tit. 14, § 15126.6, subd. (a).) "[T]here must be a disclosure of the 'analytic route the . . . agency traveled from evidence to action.' " (*Laurel Heights, supra*, 47 Cal.3d at p. 404.)

■ CEQA defines the term "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1.) The "feasibility of the alternatives must be evaluated within the context of the proposed project. 'The fact that an alternative may be more expensive or less profitable is not sufficient to show that the alternative is financially infeasible. What is required is evidence that the *additional* costs or lost profitability are sufficiently severe as to render it impractical to proceed with the project.' " (*Uphold Our Heritage v. Town of Woodside, supra*, 147 Cal.App.4th at p. 599; see *Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1181 [243 Cal.Rptr. 339].) Thus, when the cost of an alternative exceeds the cost of the proposed project, "it is the magnitude of the difference that will determine the feasibility of this alternative." (*Uphold Our Heritage v. Town of Woodside, supra*, at p. 599.)[5]

"A local agency must make an initial determination as to which alternatives are feasible and which are not. [Citation.] If an alternative is identified as at least potentially feasible, an in-depth discussion is required. [Citation.] On the other hand, when the infeasibility of an alternative is readily apparent, it 'need not be extensively considered.' " (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1457 [70 Cal.Rptr.3d 59].) "Even as to alternatives that are rejected, however, the 'EIR must explain why each suggested alternative either does not satisfy the goals of the proposed project, does not offer substantial environmental advantages[,] or cannot be accomplished.' " (*Id.* at p. 1458; see Cal. Code Regs., tit. 14, § 15091, subd. (c) [when agency finds alternatives are infeasible it must "describe the specific reasons for rejecting" them].)

---

[5] The financial wealth of the applicant does not bear on the feasibility of project alternatives. "CEQA should not be interpreted to allow discrimination between project applicants for an identical project based upon the financial status of the applicant." (*Uphold Our Heritage v. Town of Woodside, supra*, 147 Cal.App.4th at pp. 599–600; see *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 448–449 [15 Cal.Rptr.3d 322].)

## B

We agree with the trial court's assessment: the FEIR's discussion of the infeasibility of an enclosed facility is insufficient to allow informed decision-making. As to the economic aspect, the FEIR is based on costs associated with the development of only *one* enclosed composting facility by a public entity in Rancho Cucamonga. The FEIR, thus, must assume those costs are reasonable and illustrative of what enclosed facilities cost generally. The FEIR notes the capital cost of the Rancho Cucamonga project more than doubled from the initial estimate, but there is no discussion as to why. Further, there is no discussion as to why that project took longer than anticipated to develop. As the court noted, the State Department of Health Care Services informed the County during the comment period that there were enclosed facilities operating in Los Angeles County and Riverside County as well as "throughout the country," and the FEIR "should have looked at the capital and operating costs of other facilities." The FEIR acknowledges that "[w]indrows or static piles can be enclosed within a building," and in addition to the Rancho Cucamonga facility using that approach, it "is becoming more common for composting operations in urban or suburban areas." If enclosed facilities are gaining in popularity, perhaps they are economically feasible, in that a reasonable profit can be made despite increased capital costs. Because the FEIR ignores all enclosed facilities besides the Rancho Cucamonga facility, however, there is no meaningful comparative data pertaining to a range of economic issues. Since the proposed project's impact on air quality is substantial, and the most detrimental aspect of the project, a look at more than one enclosed facility is paramount. Indeed, the County presumably agrees, as it does not appeal and has agreed to abide by the writ of mandate.

Moreover, the court reasonably rejected the conclusory statement in the memorandum of Swett, Nursery Products's consultant, that "[p]rivate financing for such a risky proposition [development of an indoor composting facility] would not be available." The memorandum contains no facts or information to support the statement or to indicate Swett has any expertise in matters of composting facility financing. He introduced himself at a planning commission hearing as a member of an "environmental engineering consulting company." Under the CEQA Guidelines, "[s]ubstantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion *supported by facts*." (Cal. Code Regs., tit. 14, § 15384, subd. (b), italics added.) Swett's opinion "at best is an irrelevant generalization, too vague and nonspecific to amount to substantial evidence of anything." (*Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 157 [284 Cal.Rptr. 427].) As the trial court noted, Swett's memorandum omits vital information: "Were any lenders contacted, would government funded low interest financing be available, or was any federal grant money available?

Additionally, there is no analysis of the total cost of doing business and the prices a competitor can charge. What impact do the savings on the transportation costs have on the economic viability of the Project?"[6]

Additionally, the FEIR contains no information that an enclosed facility is technologically infeasible, other than the observation that there is no electricity at the proposed site and there were no electric lines within one mile of the site. The FEIR does not suggest that electricity cannot be supplied to the site. As the court noted, the "real question is not whether electricity can be provided to the Hawes site, but how much it will cost." The FEIR does not address the cost of bringing electricity to the site or the time involved in doing so.

■ We agree with the court's determination that substantial evidence does not support the FEIR's position that an enclosed facility alternative is infeasible and unworthy of more in-depth consideration. "The range of feasible alternatives shall be selected and discussed in a manner to foster meaningful public participation and informed decision making." (Cal. Code Regs., tit. 14, § 15126.6, subd. (f).)

IV

*Adequacy of FEIR's Water Supply Analysis*

A

■ When a city or county determines a proposed project is subject to CEQA, and it is also a "project" within the meaning of Water Code section 10912 (hereafter section 10912), subdivision (a), a WSA is required. (Wat. Code, § 10910 (hereafter section 10910), subd. (b).) The WSA is intended "to assist local governments in deciding whether to approve the projects. (See [Wat. Code,] §§ 10910–10915.)" (*O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 576 [86 Cal.Rptr.3d 1].)

As is relevant here, section 10912 defines the term "project" as including a "proposed industrial, manufacturing, or *processing plant*, or industrial park planned to house more than 1,000 persons, *occupying more than 40 acres of*

---

[6] The DEIR explains that "[w]hile the site is a number of miles from major sources of biosolids and green material, the distance to the Project site from these areas is much less than the current travel distances to disposal areas used by cities and districts in the Inland Empire and Southern California regions."

*land*, or having more than 650,000 square feet of floor area." (§ 10912, subd. (a)(5), italics added.)[7]

The WSA is prepared by the "public water system" that may provide water for the project, or, if the city or county identifies no public water system, the city or county prepares the WSA "after consulting with any entity serving domestic water supplies whose service area includes the project site, the local agency formation commission, and any public water system adjacent to the project site." (§ 10910, subd. (b).) A "public water system" is defined as "a system for the provision of piped water to the public for human consumption that has 3000 or more service connections." (§ 10912, subd. (c).)

The WSA is required to include specified information, such as "a discussion with regard to whether the total projected water supplies, determined to be available by the city or county for the project during normal, single dry, and multiple dry water years during a 20-year projection, will meet the projected water demand associated with the proposed project, in addition to existing and planned future uses, including agricultural and manufacturing uses." (§ 10910, subd. (c)(4).)

■ Further, section 10910 requires that when "a water supply for a proposed project includes groundwater," as here, the WSA must include additional information about the sufficiency of the groundwater supply. (§ 10910, subd. (f).) Without groundwater information, "the true impact of the Project on groundwater supplies cannot be adequately evaluated." (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 663 [57 Cal.Rptr.3d 663].)

The WSA must be included in any CEQA document prepared for the project. (Wat. Code, § 10911, subd. (b).) In turn, a provision of CEQA requires compliance with these Water Code provisions. (Pub. Resources Code, § 21151.9.)

---

[7] Section 10912, subdivision (a) provides in full: " 'Project' means any of the following: [¶] (1) A proposed residential development of more than 500 dwelling units. [¶] (2) A proposed shopping center or business establishment employing more than 1,000 persons or having more than 500,000 square feet of floor space. [¶] (3) A proposed commercial office building employing more than 1,000 persons or having more than 250,000 square feet of floor space. [¶] (4) A proposed hotel or motel, or both, having more than 500 rooms. [¶] (5) A proposed industrial, manufacturing, or processing plant, or industrial park planned to house more than 1,000 persons, occupying more than 40 acres of land, or having more than 650,000 square feet of floor area. [¶] (6) A mixed-use project that includes one or more of the projects specified in this subdivision. [¶] (7) A project that would demand an amount of water equivalent to, or greater than, the amount of water required by a 500 dwelling unit project."

B

It is undisputed that the FEIR does not include a WSA under section 10910. The FEIR's information about the availability of water for the proposed Hawes Project is pure speculation. It merely states that perhaps Nursery Products would use well water, perhaps it would have water trucked onto the site, and perhaps it would use a combination of those sources. There is no indication as to whether a well had been drilled to determine *actual* availability, or as to the *actual* availability or source of any imported water.

The purpose of a WSA is "to ensure that local land use authorities will thoroughly consider the availability of water supplies *before* approving major new developments," and to "respond to . . . CEQA litigation concerning water supply." (Tepper, *New Water Requirements for Large-scale Developments* (Jan. 2005) 27 L.A. Law. 18, 20, 21, italics added.) "Historically, concerns about water availability in California were addressed after, rather than before, new housing construction," a situation that "led to courts and the legislature expressing their frustration with determinations of water availability after housing construction was completed and with the attendant reliance on water that was not 'real' or 'wet.'" (*Id.* at p. 18.) Here, the FEIR harkens back to pre-WSA days by "putting the cart before the horse." (*Stanislaus National Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 200 [55 Cal.Rptr.2d 625].)

Nursery Products contends no WSA is required because the proposed Hawes Project is not a "project" within the meaning of section 10912, subdivision (a)(5), and the court erred by finding otherwise. We are unpersuaded.

■ "'Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.'" (*Estate of Pryor* (2009) 177 Cal.App.4th 1466, 1471 [99 Cal.Rptr.3d 895], italics omitted.) We construe statutory language in the context of the statute and statutory scheme as a whole, and when possible we give significance to every word and phrase. (*Ibid.*)

■ Under the plain language of section 10912, subdivision (a)(5), the proposed Hawes Project qualifies as a "project" because it is a "process-

ing plant" conducted on more than 40 acres of land.[8] We reject Nursery Products's assertion that subdivision (a)(5) of section 10912 applies only to "large scale buildings located on large square footage or plots of land." The Water Code does not define the term "processing plant," but the term "plant" is commonly defined as including the *land*, as well as buildings, machinery and fixtures, used in carrying out a trade or industrial business. (See Merriam-Webster's Collegiate Dict. (10th ed. 1996) p. 948; Webster's 3d New Internat. Dict. (1993) p. 1731.) "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122 [29 Cal.Rptr.3d 262, 112 P.3d 647].) Had the Legislature intended the statute to apply only to processing operations conducted in large buildings, we presume it would not have included acreage as a separate factor in addition to square footage of a physical structure. ▮ An open-air composting facility is a "project" within the meaning of subdivision (a)(5) of section 10912 if it meets the acreage threshold, even if the only structures onsite are small ones.

Likewise unavailing is Nursery Products's assertion that section 10912, subdivision (a)(5) applies only to operations with substantially higher water demands than those estimated for the proposed project. Nursery Products posits subdivision (a)(5) of section 10912 is applicable only when a processing plant conducted on more than 40 acres of land would demand at least as much water as a 500-dwelling-unit project would demand. Nursery Products relies on subdivision (a)(7) of section 10912, which defines a "project" as including a project "that would demand an amount of water equivalent to, or greater than, the amount of water required by a 500 dwelling unit project."

▮ Subdivision (a)(5) of section 10912, however, contains no limitation pertaining to water usage. Had the Legislature intended to include a water usage limitation it could easily have done so. The Legislature could have confined the definition of a "project" to the definition set forth in subdivision (a)(7) of section 10912, but it did not do so. To reach the result Nursery Products urges, we would have to rewrite subdivision (a)(5) of section 10912. Whatever may be thought of the wisdom, expediency, or policy of a statute, " 'we have no power to rewrite the statute to make it conform to a presumed intention that is not expressed. [Citations.]' "

---

[8] Because the language of section 10912, subdivision (a)(5) is unambiguous, and does not lend itself to the interpretation Nursery Products urges, the legislative history of the statute is immaterial. Accordingly, we deny Nursery Products's February 24, 2009 request for judicial notice of legislative history documents as well as other irrelevant documents. We also deny Nursery Products's June 29, 2009 request for judicial notice of other documents that are not included in the administrative record.

(*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 585 [94 Cal.Rptr.2d 3, 995 P.2d 139].) Any change in the law would have to come from the Legislature, not the courts.

We also reject Nursery Products's argument that section 10912, subdivision (a)(5) is inapplicable because the water for the proposed Hawes Project will not be supplied by a "public water system" or the County. In *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1131 [85 Cal.Rptr.3d 50] (*Gray*), the court stated, without any analysis, that a WSA is required "only if a 'public water system' is impacted by the Project." Again, subdivision (c) of section 10912 defines " '[p]ublic water system' " as "a system for the provision of piped water to the public for human consumption that has 3000 or more service connections."

■ We respectfully disagree with the broad statement in *Gray*. Section 10910, subdivision (b) requires that when a city or county determines CEQA review of a "project" is required, it "shall identify any water system that is, or may become as a result of supplying water to the project . . . , a public water system, as defined in Section 10912, that may supply water for the project. If the city or county is *not able to identify any public water system that may supply water for the project, the city or county shall prepare the water assessment required by this part* after consulting with any entity serving domestic water supplies whose service area includes the project site . . . ." (Italics added.) Section 10910, subdivision (c)(1)–(3) discusses the procedure when a "public water system" can be identified. Section 10910, subdivisions (b) and (c)(4) provide that if there is no identified "public water system," and the city or county must prepare a WSA, it must include certain information pertaining to projected water supplies. Subdivision (g)(1) of section 10910 provides that the "governing body of each public water system, or the city or county if either is required to comply with this act pursuant to subdivision (b), shall approve the assessment prepared pursuant to this section at a regular or special meeting." Section 10910 establishes that a WSA is required for a "project" within the meaning of section 10912, subdivision (a), even when a public water system is uninvolved.

Finally, we find meritless Nursery Products's contention Helphinkley failed to exhaust administrative remedies pertaining to a WSA under section 10910 because it did not cite the statute during the administrative proceedings. "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action. Only a proper party may petition for a writ of mandate to challenge the sufficiency of an EIR or the validity of an act or omission under CEQA. The petitioner is required to have 'objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the

project before the issuance of the notice of determination.' ([Pub. Resources Code,] § 21177, subd. (b).) The petitioner may allege as a ground of noncompliance any objection that was presented by any person or entity during the administrative proceedings." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199 [22 Cal.Rptr.3d 203].)

" 'The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.]' [Citation.] An appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies." (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 536 [78 Cal.Rptr.3d 1].)

Helphinkley has cited portions of the administrative record that show that the issue of whether the FEIR sufficiently addresses water supply for the proposed project was squarely before the County during the proceedings. Nursery Products concedes Helphinkley exhausted administrative remedies on "water supply issues." It asserts, however, that a WSA under the Water Code "is distinct from the water supply issues on which [Helphinkley] did exhaust." Nursery Products cites the following language from *Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794]: "[T]he *exact issue* raised in the lawsuit must have been presented to the administrative agency so that it will have had an opportunity to act and render the litigation unnecessary." (Italics added.) It is, however, "not necessary to identify the precise statute at issue, so long as the agency is apprised of the relevant facts and issues." (*McPherson v. City of Manhattan Beach* (2000) 78 Cal.App.4th 1252, 1264 [93 Cal.Rptr.2d 725].) In our view, the County was apprised of the relevant facts and issues, and the purpose of the exhaustion doctrine was satisfied without the citation of Water Code provisions during the administrative proceedings.

Thus, the court correctly determined the FEIR is inadequate on the additional ground that it does not include a WSA as required by section 10910.[9] We affirm the judgment.

---

[9] Given our conclusion the WSA requirement is applicable to the Hawes Project, we need not reach Helphinkley's arguments that even if a WSA is not required the FEIR's discussion of water supply is inadequate.

V

*Attorney Fees/Code of Civil Procedure Section 1021.5*

A

*Entitlement to Attorney Fees*

1

Nursery Products contends Helphinkley is not entitled to attorney fees under Code of Civil Procedure section 1021.5 (hereafter section 1021.5) for a variety of reasons.

 Section 1021.5 codifies the private attorney general doctrine adopted by the California Supreme Court in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200] (*Woodland Hills*).) " ' "The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible. [Citations.]" [Citation.] Entitlement to fees under section 1021.5 requires a showing that the litigation: "(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) [was necessary and] imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter." [Citation.]' [Citation.] In short, section 1021.5 acts as an incentive for the pursuit of public interest-related litigation that might otherwise have been too costly to bring." (*Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 511 [94 Cal.Rptr.2d 205].)[10]

 "The trial court's determination regarding the above noted three criteria of section 1021.5 lies within the court's discretion. [Citation.] The trial court is to assess the litigation realistically and determine from a

---

[10] Section 1021.5 provides in part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

practical perspective whether these criteria have been met." (*Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors, supra,* 79 Cal.App.4th at p. 511.)

"On appeal, we review the trial court's decision for abuse of discretion. [Citation.] 'In reviewing the trial court's decision, we must pay " 'particular attention to the trial court's stated reasons in denying or awarding fees and [see] whether it applied the proper standards of law in reaching its decision.' " [Citation.]' [Citation.] We will not disturb the trial court's ruling absent a showing that there is no reasonable basis in the record for the award. [Citations.] 'Particularly in a case such as this, fully briefed and argued before the same trial court which heard (and partially granted) the petition, this is not an insignificant point.' " (*RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 776 [96 Cal.Rptr.3d 362] (*RiverWatch*); see *County of Colusa v. California Wildlife Conservation Bd.* (2006) 145 Cal.App.4th 637, 648 [52 Cal.Rptr.3d 1].) It is the appellant's burden to establish an abuse of discretion. (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1338 [96 Cal.Rptr.3d 813].)

2

Nursery Products asserts the court abused its discretion by finding Helphinkley's litigation vindicated an "important right" within the meaning of section 1021.5. Nursery Products claims a fee award is unwarranted because the "two discrete issues on which [Helphinkley] prevailed" are "relatively minor" and mere "technical points."

■ It is established that section 1021.5 "does not encompass the enforcement of 'any' or 'all' statutory rights. Thus, . . . the statute directs the judiciary to exercise judgment in attempting to ascertain the 'strength' or 'societal importance' of the right involved." (*Woodland Hills, supra,* 23 Cal.3d at p. 935.) "[I]n determining the 'importance' of the particular 'vindicated' right, courts should generally realistically assess the significance of that right in terms of its relationship to the achievement of fundamental legislative goals." (*Id.* at p. 936.)

■ "It is well settled that the private attorney general theory applies to an action to enforce provisions of CEQA." (*City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 254 [227 Cal.Rptr. 899].) "[L]itigation brought to enforce the provisions of CEQA . . . has been held to involve important rights affecting the public interest, and the private attorney general theory as codified in . . . section 1021.5 applies to such suits." (*San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984)

155 Cal.App.3d 738, 754 [202 Cal.Rptr. 423]; see *Woodland Hills, supra*, 23 Cal.3d at p. 936; *Rich v. City of Benicia* (1979) 98 Cal.App.3d 428, 435 [159 Cal.Rptr. 473] ["Unquestionably environmental concerns in general and the statutory policy in favor of use of environment impact reports in particular involve preeminently important public rights."]; *Schwartz v. City of Rosemead* (1984) 155 Cal.App.3d 547, 558 [202 Cal.Rptr. 400] ["effectuation of the strong state policy expressed in CEQA was an 'important right' within the meaning of section 1021.5"].)

In its ruling, the court identified the CEQA goals that Helphinkley's litigation furthered. The court cited Public Resources Code section 21000, subdivision (g), which provides: "It is the intent of the Legislature that all agencies of the state government which regulate activities of private individuals, corporations, and public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian." The court also cited Public Resources Code section 21002, which provides: "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ."

The court explained: "In this case an enforcement of an important right affecting the public interest has occurred, namely, that the County . . . will have to adequately consider an enclosed facility as a mitigation measure, that the [F]EIR acknowledged would otherwise have a significant impact on the air quality in the area, and identify a water source for the Project. The court granted the petitioners' prayer for relief on these two issues."

We find no abuse of discretion. The grounds the court gave in support of its finding of an "important right" within the meaning of section 1021.5 are consistent with the substantive law of the statute, and their application to the facts is within the range of the court's discretion under the statute. The FEIR shows that an open-air human waste composting facility would cause harmful emissions affecting air quality in the area, and the deleterious effects can be mitigated only through the alternative of an enclosed facility. An enclosed facility would reduce harmful emissions by approximately 80 percent, yet in determining the alternative is infeasible, the FEIR gives the issue short shrift by discussing only one enclosed facility that was under development. In other words, the County did not give "major consideration" to preventing environmental damage. (Pub. Resources Code, § 21002.) The writ of mandate forces the County to conduct a more in-depth review of the matter, thus protecting an important right of the public pertaining to air quality.

Moreover, the writ forces the County to identify the actual source of water for the proposed project, and to cause a WSA to be prepared in accordance with the Water Code and the corresponding CEQA provision that mandates compliance with WSA requirements. The groundwater basin underlying the project site is in a severe overdraft condition. Helphinkley's litigation protected an important right by advancing water preservation goals and the Legislature's intent that a public agency consider the water supply for a project *before* its approval rather than after. (See *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] [purpose of EIR "is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made"].)[11]

3

Additionally, Nursery Products asserts the court's ruling constitutes abuse of discretion because Helphinkley's litigation did not confer a "significant benefit" on the general public. The court found "that a significant benefit, a reevaluation of the Hawes Project as to an enclosed facility and water supply, has been conferred on the residents of Hinkley and its environs."

██ Under the private attorney general doctrine, unlike the separate substantial benefit doctrine, the " 'significant benefit' that will justify an attorney fee award need not represent a 'tangible' asset or a 'concrete' gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy." (*Woodland Hills, supra,* 23 Cal.3d at p. 939.) "Thus, successful CEQA actions often lead to fee awards under section 1021.5" on the ground they satisfy the substantial benefit criterion. (*RiverWatch, supra,* 175 Cal.App.4th at p. 781.) "[T]he public always has a significant interest in seeing that legal strictures are properly enforced and thus, in a real sense, the public always derives a 'benefit' when illegal private or public conduct is rectified." (*Woodland Hills,* at p. 939.) "[I]n adjudicating a motion for attorney fees under section 1021.5, a trial court [should] determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Id.* at pp. 939–940.) The "extent of the public benefit need not be great to justify an attorney fee award." (*RiverWatch, supra,* at p. 781.)

---

[11] The opinions Nursery Products cites are unavailing. (See *Christward Ministry v. County of San Diego* (1993) 13 Cal.App.4th 31 [16 Cal.Rptr.2d 435] [opinion does not discuss "important right" criterion of an attorney fees award under § 1021.5]; *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892 [223 Cal.Rptr. 379] [opinion does not discuss "important right" criterion]; *Stevens v. City of Glendale* (1981) 125 Cal.App.3d 986, 1000 [178 Cal.Rptr. 367] ["appellants asserted in their petition violations of what could be deemed 'important' rights; however, they prevailed only on a technical point of lack of public notice on the final EIR"].)

Nursery Products submits that Helphinkley's litigation did not confer a significant benefit on the public because the writ of mandate "required minor additions to the [F]EIR which effectively delay the Project but do not require a significant change to the record or [F]EIR." Nursery Products points out that the writ of mandate does not compel the County to approve an enclosed facility as an alternative.

Based on the record before us, however, the writ's actual effect on the FEIR is unknown. Courts consider the "substantial benefit" criterion in the context of the outcome of the current litigation, and not on speculative future events. "[T]he benefits . . . flowed directly and immediately from the decision of the court," and residents potentially affected by the proposed open-air composting facility have benefitted from a more in-depth CEQA review, notwithstanding the ultimate outcome. (*Coalition for L.A. County Planning etc. Interest v. Board of Supervisors* (1977) 76 Cal.App.3d 241, 249, fn. 7 [142 Cal.Rptr. 766]; see also *RiverWatch, supra*, 175 Cal.App.4th at p. 782 [this court rejected argument appellants were not entitled to fees under § 1021.5 because the "defects in the CEQA process which, once corrected, were unlikely to change the landfill project"].)

Here, likewise, we reject Nursery Products's attempt to minimize the benefits the CEQA litigation here conferred on the general public. Both of the areas the court found inadequate under the FEIR, air quality and water supply, involve important environmental considerations. (See *RiverWatch, supra*, 175 Cal.App.4th at p. 782.) Nursery Products's reliance on *Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329, 333 [31 Cal.Rptr.3d 599], is misplaced, as the trial court there found there was merely a "minute blemish" as to a "mitigated negative declaration" that could be remedied without the preparation of an EIR. Contrary to Nursery Products's argument, the court here did not find "minute blemishes" in the FEIR. We find no abuse of discretion.

B

*Amount of Award*

1

Nursery Products also contends the court should have reduced attorney fees based on Helphinkley's limited success on its various challenges to the FEIR.

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. 'California courts have consistently held that a

computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award.' [Citation.] The reasonable hourly rate is that prevailing in the community for similar work. [Citations.] The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. [Citation.] Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr.2d 198, 997 P.2d 511].)

■■■ " 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . . . [Citations.] The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony. [Citations.] The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' " (*PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th at p. 1096.)

Helphinkley sought $263,708 in fees for a total of 899 hours spent on the case as follows: 103 hours to exhaust administrative remedies; 104 hours to "resolv[e] the numerous record issues"; 609 hours to address the merits; 50 hours on motions to augment and for judicial notice; eight hours to prepare the writ of mandate and judgment; and 25 hours on miscellaneous litigation tasks. Helphinkley argued it was entitled to fees for all time spent on the case, including time spent on unsuccessful theories and contentions, since it prevailed overall by obtaining a writ of mandate that stopped the project. Helphinkley also sought a multiplier of 1.5 on the lodestar amount on the grounds its attorneys accepted the case on a contingency basis, and the case precluded them from performing other work.

In support of the motion, Helphinkley submitted several declarations, including a declaration by Attorney Helen Kang of the Environmental Law & Justice Clinic in San Francisco. The declaration states the motion sought hourly rates of $100 for law students, and hourly rates of between $150 and $450 for attorneys based on their experience levels. Helphinkley also submitted daily time sheets and other documentation, such as information on billing rates, to support its claim.

Nursery Products raised a vigorous opposition to the motion for fees. Nursery Products argued, among other things, that the court should reduce any fee award to reflect Helphinkley's limited success in the litigation.

The court refused to reduce the fees based on the limited success theory. The court did, however, substantially reduce fees on several other grounds. It found the $100 hourly rate for law students was excessive, and reduced the rate to $25 per hour. Further, after reviewing attorney declarations, the court found "the time billed was excessive in certain areas." The court explained: "Although petitioners characterize this case as highly litigious, much of the contention referenced by counsel for petitioners occurred after oral argument on [the] petition. It must be remembered that petitioners are the moving party and framed the issues to be litigated when they filed their writ. CEQA litigation is not a new or little understood practice. Counsel for the petitioners are experienced in this field and capable of handling the case without having to reinvent the wheel."

The court found "that reasonable time spent on the administrative proceedings is 70 hours, and resolving issues related to the record is 70 hours." Further, the court reduced the "hours in connection with the motion to augment" to 10 hours. The court also reduced the "hours spent on the merits" to 520 hours. The court ordered that the "reductions are to be proportionately distributed to the attorneys (not law students) who did the primary work on those areas." The court found the remaining hours requested were "reasonable and sufficiently documented." The court allowed 703 hours, reducing the requested hours by 196 hours.

The reduction in hours translated to a reduction of the requested lodestar amount of $263,708 to $159,863.70, or nearly 60 percent. The court applied a multiplier of 1.5, based on the contingent nature of the fee award, which increased that amount to $239,990.55. The court explained that "[i]f petitioners were not the prevailing party, no attorney fees would be awarded. It would truly be pro bono at that point. The 1.5 requested is not excessive under the circumstances of this case; multipliers can range from 2 to 4 or even higher." The court also awarded $25,725 in fees incurred in pursuing attorney fees and costs.

██ While a court has discretion to reduce fees in a CEQA case based on degree of success (see, e.g., *Laurel Heights, supra,* 47 Cal.3d at p. 428, fn. 29), it is, of course, not required to do so. The California Supreme Court has also instructed that attorney fee awards under section 1021.5 "should be fully compensatory," and absent "circumstances rendering the award unjust, an . . . award should ordinarily include compensation for *all* the hours *reasonably spent.*" (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

In *RiverWatch, supra*, 175 Cal.App.4th 768, 783, this court rejected the argument that the trial court abused its discretion by not reducing an attorney fee award by 50 percent on the ground the plaintiffs " 'alleged a multitude of separate [CEQA] violations, resulting in sixty separate claims,' " yet they prevailed on only three issues. We noted the court had already "reduced the amount of attorney fees by nearly 50 percent on [other] grounds." (*Ibid.*) Further, we explained the defendants' "argument fails to account for the qualitative as opposed to quantitative significance of the issues included in the writ of mandate," the petition for writ relief's "clear intent was to enforce compliance with CEQA," and "[h]aving presided over briefing and trial, the court was in the best position to assess the significance of the issues remanded for further consideration and action" by the public entity. (*Ibid.*) Contrary to Nursery Products's suggestion, a court is not required to follow a formulaic reduction in CEQA cases based on the number and percentage of unsuccessful claims raised.

On this record we find no abuse of discretion. The record shows the court thoroughly considered the parties' arguments and supporting evidence, and it arrived at a reasonable and just decision that we decline to second guess. The court reduced the requested fees by nearly 60 percent based on a variety of other factors, and an additional fee reduction based on the specific number of CEQA issues that were unsuccessful would impede the Legislature's intent of "encouraging attorneys to act as private attorneys general and to vindicate important rights affecting the public interest." (*Ketchum v. Moses, supra*, 24 Cal.4th at pp. 1133–1134.) Further, Helphinkley achieved its primary objective, the rescission of Nursery Products's CUP and the requirement that the County give further consideration to the proposed project. Citizen concerns about the proposed project's adverse effect on air quality are substantial and the litigation forces the County to thoroughly reconsider the alternative of an enclosed facility.[12]

2

Nursery Products also asserts the amount of attorney fees awarded constitutes abuse of discretion because "the fees were not carefully documented," and "the trial court did not drastically reduce the number of hours and fees in light of the excessive time spent on what the trial court terms routine CEQA litigation." Nursery Products, however, develops no particular argument in support of this theory, and does not discuss any specific entries in attorney billings supporting the fee motion to show the award is improper.

[12] The record does not support Nursery Products's argument the court believed as a matter of law that it lacked discretion to reduce the fee award based on Helphinkley's lack of success on some of the CEQA issues it raised. At the hearing on Nursery Products's motion for clarification of the court's order, the court stated: "So the record's clear, I understood my discretion."

Nursery Products complains that the court allowed 520 hours on the merits, while ignoring that the court reduced the hours on the merits by 89 hours based on the complexity of issues. As to the supposed inadequacy of billing entries, Nursery Products merely cites the declaration of one of its attorneys, which states he reviewed the attorney billings and "determined that 79.8 hours . . . are either unsubstantiated or inadequately identified, or both." We cannot tell whether the court accepted or rejected that statement, or whether those hours were part of the court's fee reduction. Without any discussion by Nursery Products in its briefing of the supposed inadequacy of specific billing entries, we decline to consider the issue. It is not our job to comb through the record in search of grounds to upset the order. Nursery Products has not shown any abuse of discretion.

3

██ We also reject Nursery Products's contention the court abused its discretion by applying a multiplier of 1.5 to the lodestar amount based on the contingent nature of the fee award. The lodestar amount " 'may be adjusted by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) *the contingent nature of the fee award*.' " (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 579 [21 Cal.Rptr.3d 331, 101 P.3d 140], italics added; see *Serrano v. Priest, supra*, 20 Cal.3d 25, 49.)

██ "[T]he purpose of a fee enhancement is primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases as a class." (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1138.) "[T]he unadorned lodestar reflects the general local hourly rate for a *fee-bearing case*; it does *not* include any compensation for contingent risk, extraordinary skill, or any other factors a trial court may consider . . . . The adjustment to the lodestar figure, e.g., to provide a fee enhancement reflecting the risk that the attorney will not receive payment if the suit does not succeed, constitutes earned compensation; unlike a windfall, it is neither unexpected nor fortuitous. Rather, it is intended to approximate market-level compensation for such services, which typically includes a premium for the risk of nonpayment or delay in payment of attorney fees." (*Ibid.*) In cases involving the enforcement of constitutional or statutory rights, "such fee enhancements may make such cases economically feasible to competent private attorneys. [Citation.] '[M]ost lawyers of this quality do seem to consider the prospects of success and the fee recoverable before adding to their crowded calendars a case in which payment is contingent.' " (*Id.* at p. 1133.)

■ " '[T]he Legislature appears to have endorsed the [lodestar adjust-ment] method of calculating fees, except in certain limited situations.' [Citation.] When the Legislature has determined that the lodestar adjustment approach is not appropriate, it has expressly so stated." (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1135.)

Nursery Products asserts the 1.5 multiplier is improper because the litiga-tion was not novel or complex. Nursery Products suggests the court's finding was based in part on the novelty or complexity of the unsuccessful green-house gas issue Helphinkley raised. Helphinkley, however, did not request a multiplier on that ground. Helphinkley relied exclusively on the contingent nature of the litigation and the devotion to the case required of its attorneys, and the court relied primarily on the contingency issue. The court merely mentioned that the greenhouse gas issue was the only "difficult question" involved, and other issues were "standard CEQA issues." The ruling does not suggest the court applied a multiplier based on the greenhouse gas issue.

Additionally, Nursery Products asserts Helphinkley's out-of-area attorneys were adequately compensated for the contingent nature of the fee award by charging rates prevailing in the San Francisco Bay area rather than rates prevailing in the San Bernardino area, where the trial was held. Nursery Products cites Kang's declaration, which states Helphinkley's attorneys charged hourly rates of between $150 and $450, depending on years of experience. The declaration also states: "A true and correct copy of the December 2007 National Law Journal annual billing rate survey is attached as Exhibit E. It shows that partners at a San Francisco firm [charge] between $495 and $775, and associates charge between $275 and $485; at a Riverside firm, partners charge between $290 and $495 and associates between $160 and $350."

Thus, the rates Helphinkley's counsel charged were *below* market rates in the San Francisco area, and akin to rates charged in Riverside, which is near San Bernardino. Nursery Products also cites the declaration of Attorney Sharon Duggan, an experienced environmental litigator, on behalf of Helphinkley. The declaration states that based on the training, experience, and skill of Helphinkley's attorneys, "I believe that the rates requested here are reasonable as comparable to, *or below the market*, in the San Francisco Bay Area." (Italics added.) Nursery Products has not presented any evidence that the rates charged are not comparable to local rates for like services, or that in awarding the lodestar amount the court intended the hourly rates to compensate for the contingency factor. (See *Robertson v. Fleetwood Travel Trailers of California, Inc.* (2006) 144 Cal.App.4th 785, 823 [50 Cal.Rptr.3d 731] [court cannot use "same factors in computing the lodestar and the fee enhancement"].) Accordingly, Nursery Products's theory lacks merit.

■ Further, Nursery Products faults the trial court for not analyzing and balancing each of the factors that may be used to enhance or reduce the lodestar amount, instead of discussing only the factor that militated in favor of enhancement. Nursery Products cites no authority for the proposition the trial court is required to discuss each of the illustrative factors set forth in *Serrano v. Priest, supra*, 20 Cal.3d at page 49.[13] In *Kern River Public Access Com. v. City of Bakersfield* (1985) 170 Cal.App.3d 1205, 1228 [217 Cal.Rptr. 125], the court rejected a similar argument, concluding, "This omission, if it matters at all, does not make the award unreasonable." " 'There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation.' [Citation.] There are numerous such factors, and their evaluation is entrusted to a trial court's sound discretion; any one of those factors may be responsible for enhancing or reducing the lodestar." (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 947 [20 Cal.Rptr.3d 485].) In *Graham v. DaimlerChrysler Corp., supra*, 34 Cal.4th at page 584, the court noted the trial court was not required to explain how it calculated an enhancement factor, and "we will generally presume the attorney fee award was correct ' " 'on matters as to which the record is silent.' " ' " We disagree that the trial court here was required to further clarify its reasons for applying the 1.5 multiplier. We find no abuse of discretion.

## VI

### *Attorney Fees on Appeal*

■ Helphinkley seeks attorney fees on appeal. " '[I]t is established that fees, if recoverable at all—pursuant either to statute or [the] parties' agreement—are available for services at trial *and on appeal.*' " (*Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 927 [275 Cal.Rptr. 187, 800 P.2d 543]; see *Serrano v. Unruh* (1982) 32 Cal.3d 621, 637 [186 Cal.Rptr. 754, 652 P.2d 985].) Helphinkley is the prevailing party on appeal, and thus it is entitled to fees under section 1021.5. "Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees . . . ." (*Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498 [191 Cal.Rptr. 134].)

---

[13] Nursery Products cites *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 835 [112 Cal.Rptr.2d 284], but in that case the record contained no explanation of or justification for an enhancement. Here, the court's order explains why it applied a multiplier to the lodestar amount.

## DISPOSITION

The judgment and the attorney fees order are affirmed. The matter is remanded to the trial court for its determination of the amount of an award of attorney fees on appeal to Helphinkley. Helphinkley is also entitled to costs on appeal.

McIntyre, J., and O'Rourke, J., concurred.

On June 23, 2010, the opinion was modified to read as printed above.